KUHLMANN, SUPERINTENDENT, SULLIVAN
CORRECTIONAL FACILITY *v.* WILSON

No. 84–1479.   Argued January 14, 1986—Decided June 26, 1986

438

POWELL, J., announced the judgment of the Court and delivered the opinion of the Court with respect to Parts I, IV, and V, in which BURGER, C. J., and WHITE, BLACKMUN, REHNQUIST, and O'CONNOR, JJ., joined, and an opinion with respect to Parts II and III, in which BURGER, C. J., and REHNQUIST and O'CONNOR, JJ., joined. BURGER, C. J., filed a concurring opinion, *post*, p. 461. BRENNAN, J., filed a dissenting opinion, in which MARSHALL, J., joined, *post*, p. 461. STEVENS, J., filed a dissenting opinion, *post*, p. 476.

*Steven R. Kartagener* argued the cause for petitioner. With him on the briefs were *Mario Merola* and *Jeremy Gutman.*

*Philip S. Weber* argued the cause and filed a brief for respondent.

JUSTICE POWELL announced the judgment of the Court and delivered the opinion of the Court with respect to Parts I, IV, and V, and an opinion with respect to Parts II and III in which THE CHIEF JUSTICE, JUSTICE REHNQUIST, and JUSTICE O'CONNOR join.

This case requires us to define the circumstances under which federal courts should entertain a state prisoner's petition for writ of habeas corpus that raises claims rejected on a prior petition for the same relief.

I

In the early morning of July 4, 1970, respondent and two confederates robbed the Star Taxicab Garage in the Bronx, New York, and fatally shot the night dispatcher. Shortly

before, employees of the garage had observed respondent, a former employee there, on the premises conversing with two other men. They also witnessed respondent fleeing after the robbery, carrying loose money in his arms. After eluding the police for four days, respondent turned himself in. Respondent admitted that he had been present when the crimes took place, claimed that he had witnessed the robbery, gave the police a description of the robbers, but denied knowing them. Respondent also denied any involvement in the robbery or murder, claiming that he had fled because he was afraid of being blamed for the crimes.

After his arraignment, respondent was confined in the Bronx House of Detention, where he was placed in a cell with a prisoner named Benny Lee. Unknown to respondent, Lee had agreed to act as a police informant. Respondent made incriminating statements that Lee reported to the police. Prior to trial, respondent moved to suppress the statements on the ground that they were obtained in violation of his right to counsel. The trial court held an evidentiary hearing on the suppression motion, which revealed that the statements were made under the following circumstances.

Before respondent arrived in the jail, Lee had entered into an arrangement with Detective Cullen, according to which Lee agreed to listen to respondent's conversations and report his remarks to Cullen. Since the police had positive evidence of respondent's participation, the purpose of placing Lee in the cell was to determine the identities of respondent's confederates. Cullen instructed Lee not to ask respondent any questions, but simply to "keep his ears open" for the names of the other perpetrators. Respondent first spoke to Lee about the crimes after he looked out the cellblock window at the Star Taxicab Garage, where the crimes had occurred. Respondent said, "someone's messing with me," and began talking to Lee about the robbery, narrating the same story that he had given the police at the time of his arrest. Lee advised respondent that this explanation "didn't

sound too good,"[1] but respondent did not alter his story. Over the next few days, however, respondent changed details of his original account. Respondent then received a visit from his brother, who mentioned that members of his family were upset because they believed that respondent had murdered the dispatcher. After the visit, respondent again described the crimes to Lee. Respondent now admitted that he and two other men, whom he never identified, had planned and carried out the robbery, and had murdered the dispatcher. Lee informed Cullen of respondent's statements and furnished Cullen with notes that he had written surreptitiously while sharing the cell with respondent.

After hearing the testimony of Cullen and Lee,[2] the trial court found that Cullen had instructed Lee "to ask no questions of [respondent] about the crime but merely to listen as to what [respondent] might say in his presence." The court determined that Lee obeyed these instructions, that he "at no time asked any questions with respect to the crime," and that he "only listened to [respondent] and made notes regarding what [respondent] had to say." The trial court also found that respondent's statements to Lee were "spontaneous" and "unsolicited." Under state precedent, a defendant's volunteered statements to a police agent were admissible in evidence because the police were not required to prevent talkative defendants from making incriminating statements. See *People* v. *Kaye*, 25 N. Y. 2d 139, 145, 250 N. E. 2d 329, 332 (1969). The trial court accordingly denied the suppression motion.

---

[1] At the suppression hearing, Lee testified that, after hearing respondent's initial version of his participation in the crimes, "I think I remember telling him that the story wasn't—it didn't sound too good. Things didn't look too good for him." At trial, Lee testified to a somewhat different version of his remark: "Well, I said, look, you better come up with a better story than that because that one doesn't sound too cool to me, that's what I said."

[2] Respondent did not testify at the suppression hearing.

The jury convicted respondent of common-law murder and felonious possession of a weapon. On May 18, 1972, the trial court sentenced him to a term of 20 years to life on the murder count and to a concurrent term of up to 7 years on the weapons count. The Appellate Division affirmed without opinion, *People* v. *Wilson*, 41 App. Div. 2d 903, 343 N. Y. S. 2d 563 (1973), and the New York Court of Appeals denied respondent leave to appeal.

On December 7, 1973, respondent filed a petition for federal habeas corpus relief. Respondent argued, among other things, that his statements to Lee were obtained pursuant to police investigative methods that violated his constitutional rights. After considering *Massiah* v. *United States*, 377 U. S. 201 (1964), the District Court for the Southern District of New York denied the writ on January 7, 1977. The record demonstrated "no interrogation whatsoever" by Lee and "only spontaneous statements" from respondent. In the District Court's view, these "fact[s] preclude[d] any Sixth Amendment violation."

A divided panel of the Court of Appeals for the Second Circuit affirmed. *Wilson* v. *Henderson*, 584 F. 2d 1185 (1978). The court noted that a defendant is denied his Sixth Amendment rights when the trial court admits in evidence incriminating statements that state agents "'had deliberately elicited from him after he had been indicted and in the absence of counsel.'" *Id.*, at 1189, quoting *Massiah* v. *United States*, *supra*, at 206. Relying in part on *Brewer* v. *Williams*, 430 U. S. 387 (1977), the court reasoned that the "deliberately elicited" test of *Massiah* requires something more than incriminating statements uttered in the absence of counsel. On the facts found by the state trial court, which were entitled to a presumption of correctness under 28 U. S. C. § 2254(d), the court held that respondent had not established a violation of his Sixth Amendment rights.[3] We denied a

---

[3] The Court of Appeals observed that suppression of respondent's statements would serve "no useful purpose" because Cullen had not engaged in

petition for a writ of certiorari. *Wilson* v. *Henderson,* 442 U. S. 945 (1979).

Following this Court's decision in *United States* v. *Henry,* 447 U. S. 264 (1980), which applied the *Massiah* test to suppress statements made to a paid jailhouse informant, respondent decided to relitigate his Sixth Amendment claim. On September 11, 1981, he filed in state trial court a motion to vacate his conviction. The judge denied the motion, on the grounds that *Henry* was factually distinguishable from this case,[4] and that under state precedent *Henry* was not to be given retroactive effect, see *People* v. *Pepper,* 53 N. Y. 2d 213, 423 N. E. 2d 366 (1981). The Appellate Division denied respondent leave to appeal.

On July 6, 1982, respondent returned to the District Court for the Southern District of New York on a habeas petition, again arguing that admission in evidence of his incriminating statements to Lee violated his Sixth Amendment rights. Respondent contended that the decision in *Henry* constituted a new rule of law that should be applied retroactively to this case. The District Court found it unnecessary to consider retroactivity because it decided that *Henry* did not undermine the Court of Appeals' prior disposition of respondent's Sixth Amendment claim. Noting that *Henry* reserved the question whether the Constitution forbade admission in evidence of an accused's statements to an informant who made "no effort to stimulate conversations about the crime charged," see *United States* v. *Henry, supra,* at 271, n. 9,

---

"reprehensible police behavior," but rather had made a "conscious effort" to protect respondent's "constitutional rights [under *Massiah*] while pursuing a crucial homicide investigation." *Wilson* v. *Henderson,* 584 F. 2d, at 1191.

Judge Oakes dissented, arguing that the "deliberately elicited" test of *Massiah* proscribed admission in evidence of an accused's statements obtained pursuant to the investigatory tactics used here. *Id.,* at 1194–1195.

[4] The trial judge found that *United States* v. *Henry* was distinguishable because the jailhouse informant in that case was paid for reporting the defendant's statements to the police.

the District Court believed that this case presented that open question and that the question must be answered negatively. The District Court noted that the trial court's findings were presumptively correct, see 28 U. S. C. § 2254(d), and were fully supported by the record. The court concluded that these findings were "fatal" to respondent's claim under *Henry* since they showed that Lee made no "affirmative effort" of any kind "to elicit information" from respondent.

A different, and again divided, panel of the Court of Appeals reversed. *Wilson* v. *Henderson*, 742 F. 2d 741 (1984). As an initial matter, the court stated that, under *Sanders* v. *United States*, 373 U. S. 1 (1963), the "ends of justice" required consideration of this petition, notwithstanding the fact that the prior panel had determined the merits adversely to respondent. 742 F. 2d, at 743. The court then reasoned that the circumstances under which respondent made his incriminating statements to Lee were indistinguishable from the facts of *Henry*. Finally, the court decided that *Henry* was fully applicable here because it did not announce a new constitutional rule, but merely applied settled principles to new facts. 742 F. 2d, at 746–747. Therefore, the court concluded that all of the judges who had considered and rejected respondent's claim had erred, and remanded the case to the District Court with instructions to order respondent's release from prison unless the State elected to retry him.[5]

---

[5] Judge Van Graafeiland, dissenting, observed that the majority conceded that there had been no change in the law that had "transformed conduct that we formerly held to be constitutional into conduct that is now unconstitutional." 742 F. 2d, at 749. Thus, the majority's rejection of the conclusion reached by the judges who previously had considered respondent's claim was based on its refusal to accept the trial court's factual determinations. *Id.*, at 748. The dissent criticized the majority for disregarding "the presumption that the State court's factual findings are correct, 28 U. S. C. § 2254(d), without an adequate explanation as to why the findings are not fairly supported by the record." *Id.*, at 749. In Judge Van Graafeiland's view, "[a] boilerplate statement that the 'ends of justice'

We granted certiorari, 472 U. S. 1026 (1985), to consider the Court of Appeals' decision that the "ends of justice" required consideration of this successive habeas corpus petition and that court's application of our decision in *Henry* to the facts of this case. We now reverse.

## II

### A

In concluding that it was appropriate to entertain respondent's successive habeas corpus petition, the Court of Appeals relied upon *Sanders* v. *United States*, 373 U. S. 1 (1963), which announced guidelines for the federal courts to follow when presented with habeas petitions or their equivalent claimed to be "successive" or an "abuse of the writ."[6] The narrow question in *Sanders* was whether a federal prisoner's motion under 28 U. S. C. § 2255 was properly denied without a hearing on the ground that the motion constituted a successive application. *Id.*, at 4–6. The Court undertook not only to answer that question, but also to explore the standard that should govern district courts' consideration of successive petitions. *Sanders* framed the inquiry in terms of the requirements of the "ends of justice," advising district courts to dismiss habeas petitions or their equivalent raising claims determined adversely to the prisoner on a prior petition if

---

justify reconsideration on the merits does not warrant rejection of all that has gone on before." *Ibid.* (citations omitted).

[6] The terms "successive petition" and "abuse of the writ" have distinct meanings. A "successive petition" raises grounds identical to those raised and rejected on the merits on a prior petition. See *Sanders* v. *United States*, 373 U. S., at 15–17. Our decision today concerns the circumstances under which district courts properly should entertain the merits of such a petition. The concept of "abuse of the writ" is founded on the equitable nature of habeas corpus. Thus, where a prisoner files a petition raising grounds that were available but not relied upon in a prior petition, or engages in other conduct that "disentitle[s] him to the relief he seeks," the federal court may dismiss the subsequent petition on the ground that the prisoner has abused the writ. *Id.*, at 17–19.

"the ends of justice would not be served by reaching the merits of the subsequent application." *Id.*, at 15, 16–17. While making clear that the burden of proof on this issue rests on the prisoner, *id.*, at 17, the Court in *Sanders* provided little specific guidance as to the kind of proof that a prisoner must offer to establish that the "ends of justice" would be served by relitigation of the claims previously decided against him.

The Court of Appeals' decision in this case demonstrates the need for this Court to provide that guidance. The opinion of the Court of Appeals sheds no light on this important threshold question, merely declaring that the "ends of justice" required successive federal habeas corpus review. Failure to provide clear guidance leaves district judges "at large in disposing of applications for a writ of habeas corpus," creating the danger that they will engage in "the exercise not of law but of arbitrariness." *Brown* v. *Allen*, 344 U. S. 443, 497 (1953) (opinion of Frankfurter, J.). This Court therefore must now define the considerations that should govern federal courts' disposition of successive petitions for habeas corpus.

### B

Since 1867, when Congress first authorized the federal courts to issue the writ on behalf of persons in state custody,[7] this Court often has been called upon to interpret the language of the statutes defining the scope of that jurisdiction. It may be helpful to review our cases construing these frequently used statutes before we answer the specific question before us today.

Until the early years of this century, the substantive scope of the federal habeas corpus statutes was defined by refer-

---

[7] The Judiciary Act of 1789, ch. 20, § 14, 1 Stat. 81, the first grant of jurisdiction to the federal courts, included authority to issue the writ of habeas corpus *ad subjiciendum* on behalf of federal prisoners. In 1867, Congress authorized the federal courts to grant habeas relief to persons in the custody of the States. Act of Feb. 5, 1867, ch. 28, § 1, 14 Stat. 385. See *Stone* v. *Powell*, 428 U. S. 465, 474–475 (1976).

ence to the scope of the writ at common law, where the courts' inquiry on habeas was limited exclusively "to the jurisdiction of the sentencing tribunal." *Stone* v. *Powell*, 428 U. S. 465, 475 (1976). See *Wainwright* v. *Sykes*, 433 U. S. 72, 78, 79 (1977); see also Oaks, Legal History in the High Court—Habeas Corpus, 64 Mich. L. Rev. 451, 458–468 (1966). Thus, the finality of the judgment of a committing court of competent jurisdiction was accorded absolute respect on habeas review. See *Schneckloth* v. *Bustamonte*, 412 U. S. 218, 254–256 (1973) (POWELL, J., concurring). During this century, the Court gradually expanded the grounds on which habeas corpus relief was available, authorizing use of the writ to challenge convictions where the prisoner claimed a violation of certain constitutional rights. See *Wainwright* v. *Sykes, supra,* at 79–80; *Stone* v. *Powell, supra,* at 475–478. The Court initially accomplished this expansion while purporting to adhere to the inquiry into the sentencing court's jurisdiction. *Wainwright* v. *Sykes,* 433 U. S., at 79. Ultimately, the Court abandoned the concept of jurisdiction and acknowledged that habeas "review is available for claims of 'disregard of the constitutional rights of the accused, and where the writ is the only effective means of preserving his rights.'" *Ibid.,* quoting *Waley* v. *Johnston,* 316 U. S. 101, 104–105 (1942).

Our decisions have not been limited to expanding the scope of the writ. Significantly, in *Stone* v. *Powell,* we removed from the reach of the federal habeas statutes a state prisoner's claim that "evidence obtained in an unconstitutional search or seizure was introduced at his trial" unless the prisoner could show that the State had failed to provide him "an opportunity for full and fair litigation" of his Fourth Amendment claim. 428 U. S., at 494 (footnotes omitted). Although the Court previously had accepted jurisdiction of search and seizure claims, *id.,* at 480, we were persuaded that any "advance of the legitimate goal of furthering Fourth Amendment rights" through application of the judicially cre-

ated exclusionary rule on federal habeas was "outweighed by the acknowledged costs to other values vital to a rational system of criminal justice." *Id.*, at 494. Among those costs were diversion of the attention of the participants at a criminal trial "from the ultimate question of guilt or innocence," and exclusion of reliable evidence that was "often the most probative information bearing on the guilt or innocence of the defendant." *Id.*, at 490. Our decision to except this category of claims from habeas corpus review created no danger that we were denying a "safeguard against compelling an innocent man to suffer an unconstitutional loss of liberty." *Id.*, at 491–492, n. 31. Rather, a convicted defendant who pressed a search and seizure claim on collateral attack was "usually asking society to redetermine an issue that ha[d] no bearing on the basic justice of his incarceration." *Id.*, at 492, n. 31.

In decisions of the past two or three decades construing the reach of the habeas statutes, whether reading those statutes broadly or narrowly, the Court has reaffirmed that "habeas corpus has traditionally been regarded as governed by equitable principles." *Fay* v. *Noia*, 372 U. S. 391, 438 (1963), citing *United States ex rel. Smith* v. *Baldi*, 344 U. S. 561, 573 (1953) (dissenting opinion). See *Stone* v. *Powell, supra,* at 478, n. 11. The Court uniformly has been guided by the proposition that the writ should be available to afford relief to those "persons whom society has grievously wronged" in light of modern concepts of justice. *Fay* v. *Noia, supra,* at 440–441. See *Stone* v. *Powell, supra,* at 492, n. 31. Just as notions of justice prevailing at the inception of habeas corpus were offended when a conviction was issued by a court that lacked jurisdiction, so the modern conscience found intolerable convictions obtained in violation of certain constitutional commands. But the Court never has defined the scope of the writ simply by reference to a perceived need to assure that an individual accused of crime is afforded a trial free of constitutional error. Rather, the Court has performed its

statutory task through a sensitive weighing of the interests implicated by federal habeas corpus adjudication of constitutional claims determined adversely to the prisoner by the state courts. *E. g., Engle* v. *Isaac,* 456 U. S. 107, 126–129 (1982); *Stone* v. *Powell, supra,* at 489–495; *Fay* v. *Noia, supra,* at 426–434.[8]

## III

### A

The Court in *Sanders* drew the phrase "ends of justice" directly from the version of 28 U. S. C. § 2244 in effect in 1963. The provision, which then governed petitions filed by both federal and state prisoners, stated in relevant part that no federal judge "shall be required to entertain an application for a writ of habeas corpus to inquire into the detention of a person . . . , if it appears that the legality of such detention has been determined" by a federal court "on a prior application for a writ of habeas corpus and the petition presents no new ground not theretofore presented and determined, and the judge . . . is satisfied that the *ends of justice will not be served by such inquiry.*" 28 U. S. C. § 2244 (1964 ed.) (emphasis added). Accordingly, in describing guidelines for suc-

---

[8] Contrary to the suggestion of JUSTICE BRENNAN's dissent, our cases deciding that federal habeas review ordinarily does not extend to procedurally defaulted claims plainly concern the "general scope of the writ." *Post,* at 464. The point of those decisions is that, on balancing the competing interests implicated by affording federal collateral relief to persons in state custody, federal courts should not exercise habeas corpus jurisdiction over a certain category of constitutional claims, whether or not those claims are meritorious. Whether one characterizes those decisions as carving out an "exception" to federal habeas jurisdiction, as the dissent apparently prefers to do, *post,* at 465, n. 3, or as concerning the scope of that jurisdiction, the result is the same, and was reached under a framework of analysis that weighed the pertinent interests. Similarly, in *Fay* v. *Noia,* JUSTICE BRENNAN's opinion for the Court expressly made a "practical appraisal of the state interest" in a system of procedural forfeitures, weighing that interest against the other interests implicated by federal collateral review of procedurally defaulted claims. 372 U. S., at 433. Of course, that the Court in *Noia* adopted an expansive reading of the scope of the writ does not undercut the fact that it did so by balancing competing interests.

cessive petitions, *Sanders* did little more than quote the language of the then-pertinent statute, leaving for another day the task of giving that language substantive content.

In 1966, Congress carefully reviewed the habeas corpus statutes and amended their provisions, including § 2244. Section 2244(b), which we construe today, governs successive petitions filed by state prisoners. The section makes no reference to the "ends of justice,"[9] and provides that the federal courts "need not" entertain "subsequent applications" from state prisoners "unless the application alleges and is predicated on a factual or other ground not adjudicated on" the prior application "and unless the court . . . is satisfied that the applicant has not on the earlier application deliberately withheld the newly asserted ground or otherwise abused the writ."[10] In construing this language, we are cognizant that Congress adopted the section in light of the need—often recognized by this Court—to weigh the interests of the individual prisoner against the sometimes contrary interests of the State in administering a fair and rational system of criminal laws.[11]

---

[9] In § 2244(a), which now governs successive petitions filed by federal prisoners, Congress preserved virtually intact the language of former § 2244, including the reference to the "ends of justice."

[10] Title 28 U. S. C. § 2244(b) provides:

"When after an evidentiary hearing on the merits of a material factual issue, or after a hearing on the merits of an issue of law, a person in custody pursuant to the judgment of a State court has been denied by a court of the United States or a justice or judge of the United States release from custody or other remedy on an application for a writ of habeas corpus, a subsequent application for a writ of habeas corpus in behalf of such person need not be entertained by a court of the United States or a justice or judge of the United States unless the application alleges and is predicated on a factual or other ground not adjudicated on the hearing of the earlier application for the writ, and unless the court, justice, or judge is satisfied that the applicant has not on the earlier application deliberately withheld the newly asserted ground or otherwise abused the writ."

[11] Sensitivity to the interests implicated by federal habeas corpus review is implicit in the statutory command that the federal courts "shall . . . dis-

The legislative history demonstrates that Congress intended the 1966 amendments, including those to § 2244(b), to introduce "a greater degree of finality of judgments in habeas corpus proceedings." S. Rep. No. 1797, 89th Cong., 2d Sess., 2 (1966) (Senate Report). Congress was concerned with the "steadily increasing" burden imposed on the federal courts by "applications by State prisoners for writs of habeas corpus."[12]  *Id.*, at 1; see H. R. Rep. No. 1892, 89th Cong., 2d Sess., 5–6 (1966) (House Report). In many instances, the "heavy burden" created by these applications was "unnecessary" because state prisoners "have been filing applications either containing allegations identical to those asserted in a previous application that has been denied, or predicated upon grounds obviously well known to them when they filed the preceding application." Senate Report, at 2; see House Report, at 5. The Senate Report explicitly states that the "purpose" of the amendments was to "alleviate the unnecessary burden" by adding "to section 2244 . . . provisions for a qualified application of the doctrine of res judicata." Senate Report, at 2; see House Report, at 8. The House also

pose of the matter as law *and justice* require." 28 U. S. C. § 2243 (emphasis added).

[12] The Senate Report incorporates a letter from Senior Circuit Judge Orie L. Phillips to Senator Joseph D. Tydings that states:
"The need for this legislation . . . is demonstrated by the fact that the number of applications for writs of habeas corpus in Federal courts by State court prisoners increased from 134 in 1941 to 814 in 1957. In fiscal 1963, 1,692 applications for the writ were filed by State court prisoners; in fiscal 1964, 3,248 such applications were filed; in fiscal 1965, 4,845 such applications were filed; and in the first 9 months of fiscal 1966, 3,773 such applications were filed, yet less than 5 percent of such applications were decided by the Federal district courts in favor of the applicant for the writ. More than 95 percent were held to be without merit." Senate Report, at 4, 5–6.

Since 1966, the burden imposed by applications for federal habeas corpus filed by state prisoners has continued to increase. In 1966, a total of 5,339 such applications was filed. In 1985, 8,534 applications were filed. Annual Report of the Director of the Administrative Office of the U. S. Courts (1985).

expressed concern that the increasing number of habeas applications from state prisoners "greatly interfered with the procedures and processes of the State courts by delaying, in many cases, the proper enforcement of their judgments." *Id.*, at 5.

Based on the 1966 amendments and their legislative history, petitioner argues that federal courts no longer must consider the "ends of justice" before dismissing a successive petition. We reject this argument. It is clear that Congress intended for district courts, as the general rule, to give preclusive effect to a judgment denying on the merits a habeas petition alleging grounds identical in substance to those raised in the subsequent petition. But the permissive language of § 2244(b) gives federal courts discretion to entertain successive petitions under some circumstances. Moreover, Rule 9(b) of the Rules Governing Section 2254 Cases in the United States District Courts, which was amended in 1976, contains similar permissive language, providing that the district court "may" dismiss a "second or successive petition" that does not "allege new or different grounds for relief." Consistent with Congress' intent in enacting § 2244(b), however, the Advisory Committee Note to Rule 9(b), 28 U. S. C., p. 358, states that federal courts should entertain successive petitions only in "rare instances."[13] Unless those "rare instances" are to be identified by whim or caprice, district judges must be given guidance for determining when to exercise the limited discretion granted them by § 2244(b). Accordingly, as a means of identifying the rare case in which federal courts should exercise their discretion to hear a successive petition, we continue to rely on the reference in *Sanders* to the "ends of justice." Our task is to provide a definition of the "ends of justice" that will accommodate Congress' intent to give finality to federal habeas judgments with

---

[13] The Advisory Committee Note relies on the "ends of justice" inquiry described in *Sanders* to identify the unusual case where a successive petition should be heard.

the historic function of habeas corpus to provide relief from unjust incarceration.

## B

We now consider the limited circumstances under which the interests of the prisoner in relitigating constitutional claims held meritless on a prior petition may outweigh the countervailing interests served by according finality to the prior judgment. We turn first to the interests of the prisoner.

The prisoner may have a vital interest in having a second chance to test the fundamental justice of his incarceration. Even where, as here, the many judges who have reviewed the prisoner's claims in several proceedings provided by the State and on his first petition for federal habeas corpus have determined that his trial was free from constitutional error, a prisoner retains a powerful and legitimate interest in obtaining his release from custody if he is innocent of the charge for which he was incarcerated. That interest does not extend, however, to prisoners whose guilt is conceded or plain. As Justice Harlan observed, the guilty prisoner himself has "an interest in insuring that there will at some point be the certainty that comes with an end to litigation, and that attention will ultimately be focused not on whether a conviction was free from error but rather on whether the prisoner can be restored to a useful place in the community." *Sanders* v. *United States*, 373 U. S., at 24–25 (dissenting).

Balanced against the prisoner's interest in access to a forum to test the basic justice of his confinement are the interests of the State in administration of its criminal statutes. Finality serves many of those important interests. Availability of unlimited federal collateral review to guilty defendants frustrates the State's legitimate interest in deterring crime, since the deterrent force of penal laws is diminished to the extent that persons contemplating criminal activity believe there is a possibility that they will escape punishment

through repetitive collateral attacks.[14]   See *Engle* v. *Isaac*, 456 U. S., at 127–128, n. 32.   Similarly, finality serves the State's goal of rehabilitating those who commit crimes because "[r]ehabilitation demands that the convicted defendant realize that 'he is justly subject to sanction, that he stands in need of rehabilitation.'"   *Id.*, at 128, n. 32 (quoting Bator, Finality in Criminal Law and Federal Habeas Corpus for State Prisoners, 76 Harv. L. Rev. 441, 452 (1963)).   See *Schneckloth* v. *Bustamonte*, 412 U. S., at 262 (POWELL, J., concurring).   Finality also serves the State's legitimate punitive interests.   When a prisoner is freed on a successive petition, often many years after his crime, the State may be unable successfully to retry him.[15]   *Peyton* v. *Rowe*, 391 U. S. 54, 62 (1968).   This result is unacceptable if the State must forgo conviction of a guilty defendant through the "erosion of memory" and "dispersion of witnesses" that occur with the passage of time that invariably attends collateral attack.[16]

---

[14] "Deterrence depends upon the expectation that 'one violating the law will swiftly and certainly become subject to punishment, just punishment.'"   *Engle* v. *Isaac*, 456 U. S. 107, 127–128, n. 32 (1982), quoting Bator, Finality in Criminal Law and Federal Habeas Corpus for State Prisoners, 76 Harv. L. Rev. 441, 452 (1963).

[15] Where the prisoner secures his release on a successive petition, the delay between the crime and retrial following issuance of the writ often will be substantial.   The delay in this case is illustrative.   Respondent committed the robbery and murder in 1970, and was convicted in 1972.   Direct appeal was completed in 1973.   The intervening years have been largely consumed by federal habeas corpus review, with the past four years devoted to relitigation of respondent's claim that admission in evidence of his statements to Lee violated the Sixth Amendment.

[16] Finality serves other goals important to our system of criminal justice and to federalism.   Unlimited availability of federal collateral attack burdens our criminal justice system as successive petitions divert the "time of judges, prosecutors, and lawyers" from the important task of trying criminal cases.   Friendly, Is Innocence Irrelevant? Collateral Attack on Criminal Judgments, 38 U. Chi. L. Rev. 142, 148–149 (1970).   See *Engle* v. *Isaac*, *supra*, at 127.   Federal habeas review creates friction between our state and federal courts, as state judges—however able and thorough— know that their judgments may be set aside by a single federal judge,

*Engle* v. *Isaac, supra,* at 127–128; Friendly, Is Innocence Irrelevant? Collateral Attack on Criminal Judgments, 38 U. Chi. L. Rev. 142, 146–148 (1970).

In the light of the historic purpose of habeas corpus and the interests implicated by successive petitions for federal habeas relief from a state conviction, we conclude that the "ends of justice" require federal courts to entertain such petitions only where the prisoner supplements his constitutional claim with a colorable showing of factual innocence. This standard was proposed by Judge Friendly more than a decade ago as a prerequisite for federal habeas review generally. Friendly, *supra.* As Judge Friendly persuasively argued then, a requirement that the prisoner come forward with a colorable showing of innocence identifies those habeas petitioners who are justified in again seeking relief from their incarceration. We adopt this standard now to effectuate the clear intent of Congress that successive federal habeas review should be granted only in rare cases, but that it should be available when the ends of justice so require. The prisoner may make the requisite showing by establishing that under the probative evidence he has a colorable claim of factual innocence. The prisoner must make his evidentiary showing even though—as argued in this case—the evidence of guilt may have been unlawfully admitted.[17]

---

years after it was entered and affirmed on direct appeal. See 456 U. S., at 128. Moreover, under our federal system the States "possess primary authority for defining and enforcing the criminal law," and "hold the initial responsibility for vindicating constitutional rights. Federal intrusions into state criminal trials frustrate both the States' sovereign power to punish offenders and their good-faith attempts to honor constitutional rights." *Ibid.,* citing *Schneckloth* v. *Bustamonte,* 412 U. S. 218, 263–265 (1983) (POWELL, J., concurring). Despite those costs, Congress has continued to afford federal habeas relief in appropriate cases, "recognizing the need in a free society for an additional safeguard against compelling an innocent [person] to suffer an unconstitutional loss of liberty." *Stone* v. *Powell,* 428 U. S., at 491–492, n. 31.

[17] As Judge Friendly explained, a prisoner does not make a colorable showing of innocence "by showing that he might not, or even would not, have been convicted in the absence of evidence claimed to have been uncon-

## C

Applying the foregoing standard in this case, we hold that the Court of Appeals erred in concluding that the "ends of justice" would be served by consideration of respondent's successive petition. The court conceded that the evidence of respondent's guilt "was nearly overwhelming." 742 F. 2d, at 742. The constitutional claim argued by respondent does not itself raise any question as to his guilt or innocence. The District Court and the Court of Appeals should have dismissed this successive petition under § 2244(b) on the ground that the prior judgment denying relief on this identical claim was final.[18]

stitutionally obtained." Friendly, *supra*, at 160. Rather, the prisoner must "show a fair probability that, in light of all the evidence, including that alleged to have been illegally admitted (but with due regard to any unreliability of it) and evidence tenably claimed to have been wrongly excluded or to have become available only after the trial, the trier of the facts would have entertained a reasonable doubt of his guilt." *Ibid.* (footnote omitted). Thus, the question whether the prisoner can make the requisite showing must be determined by reference to *all* probative evidence of guilt or innocence.

[18] JUSTICE BRENNAN's dissenting opinion mischaracterizes our opinion in several respects. The dissent states that the plurality *"implies* that federal habeas review is not available as a matter of right to a prisoner who alleges in his *first* federal petition a properly preserved [constitutional claim]." *Post,* at 462 (emphasis added). This case involves, and our opinion describes, *only* the standard applicable to *successive* petitions for federal habeas corpus relief. Thus, the first six pages of the dissent have little, if any, relevance to this case. There, JUSTICE BRENNAN merely reiterates at length his views as to the general scope of federal habeas corpus jurisdiction, with no explanation of how those views apply when a district judge is required to consider a habeas corpus petition presenting an issue decided on the merits in a previous federal habeas proceeding.

The dissent further mistakenly asserts that we reject *Sanders'* holding that the question whether successive review is proper should be decided under a "'sound discretion' standard." *Post,* at 462. As we have stated, the permissive language of § 2244(b) of course gives the federal courts discretion to decide whether to entertain a successive petition, and since *Sanders* those courts have relied on the phrase "ends of justice" as a general standard for identifying cases in which successive review may be appropriate. What *Sanders* left open—and the dissent today ignores—is the

## IV

Even if the Court of Appeals had correctly decided to entertain this successive habeas petition, we conclude that it erred in holding that respondent was entitled to relief under *United States* v. *Henry*, 447 U. S. 264 (1980). As the District Court observed, *Henry* left open the question whether the Sixth Amendment forbids admission in evidence of an accused's statements to a jailhouse informant who was "placed in close proximity but [made] no effort to stimulate conversations about the crime charged." *Id.*, at 271, n. 9.[19] Our review of the line of cases beginning with *Massiah* v. *United States*, 377 U. S. 201 (1964), shows that this question must, as the District Court properly decided, be answered negatively.

## A

The decision in *Massiah* had its roots in two concurring opinions written in *Spano* v. *New York*, 360 U. S. 315 (1959). See *Maine* v. *Moulton*, 474 U. S. 159, 172 (1985). Following his indictment for first-degree murder, the defendant in *Spano* retained a lawyer and surrendered to the authorities. Before leaving the defendant in police custody, counsel cautioned him not to respond to interrogation. The prosecutor and police questioned the defendant, persisting in the face of his repeated refusal to answer and his repeated request to speak with his lawyer. The lengthy interrogation involved improper police tactics, and the defendant ultimately con-

critical question of what considerations should inform a court's decision that successive review of an issue previously decided will serve the "ends of justice." While the dissent today purports to provide some substance to the *Sanders* standard by requiring a "good justification" for relitigation of a claim previously decided, its standard provides no real guidance to federal courts confronted with successive claims for habeas corpus relief. As to the need for a standard, see *supra*, at 445.

[19] In *Maine* v. *Moulton*, 474 U. S. 159 (1985), we again reserved this question, declining to reach the situation where the informant acts simply as a " 'listening post' " without "participat[ing] in active conversation and prompt[ing] particular replies." *Id.*, at 177, n. 13.

fessed. Following a trial at which his confession was admitted in evidence, the defendant was convicted and sentenced to death. 360 U. S., at 316–320. Agreeing with the Court that the confession was involuntary and thus improperly admitted in evidence under the Fourteenth Amendment, the concurring Justices also took the position that the defendant's right to counsel was violated by the secret interrogation. *Id.*, at 325 (Douglas, J., concurring). As Justice Stewart observed, an indicted person has the right to assistance of counsel throughout the proceedings against him. *Id.*, at 327. The defendant was denied that right when he was subjected to an "all-night inquisition," during which police ignored his repeated requests for his lawyer. *Ibid.*

The Court in *Massiah* adopted the reasoning of the concurring opinions in *Spano* and held that, once a defendant's Sixth Amendment right to counsel has attached, he is denied that right when federal agents "deliberately elicit" incriminating statements from him in the absence of his lawyer. 377 U. S., at 206. The Court adopted this test, rather than one that turned simply on whether the statements were obtained in an "interrogation," to protect accused persons from " 'indirect and surreptitious interrogations as well as those conducted in the jailhouse. In this case, Massiah was more seriously imposed upon . . . because he did not even know that he was under interrogation by a government agent.'" *Ibid.*, quoting *United States* v. *Massiah*, 307 F. 2d 62, 72–73 (1962) (Hays, J., dissenting in part). Thus, the Court made clear that it was concerned with interrogation or investigative techniques that were equivalent to interrogation, and that it so viewed the technique in issue in *Massiah*.[20]

---

[20] The defendant in *Massiah* made the incriminating statements in a conversation with one of his confederates, who had secretly agreed to permit Government agents to listen to the conversation over a radio transmitter. The agents instructed the confederate to "engage Massiah in conversation relating to the alleged crimes." *United States* v. *Massiah*, 307 F. 2d, at 72 (Hays, J., dissenting in part).

In *United States* v. *Henry*, the Court applied the *Massiah* test to incriminating statements made to a jailhouse informant. The Court of Appeals in that case found a violation of *Massiah* because the informant had engaged the defendant in conversations and "had developed a relationship of trust and confidence with [the defendant] such that [the defendant] revealed incriminating information." 447 U. S., at 269. This Court affirmed, holding that the Court of Appeals reasonably concluded that the Government informant "deliberately used his position to secure incriminating information from [the defendant] when counsel was not present." *Id.*, at 270. Although the informant had not questioned the defendant, the informant had "stimulated" conversations with the defendant in order to "elicit" incriminating information. *Id.*, at 273; see *id.*, at 271, n. 9. The Court emphasized that those facts, like the facts of *Massiah*, amounted to "'indirect and surreptitious interrogatio[n]'" of the defendant. 447 U. S., at 273.

Earlier this Term, we applied the *Massiah* standard in a case involving incriminating statements made under circumstances substantially similar to the facts of *Massiah* itself. In *Maine* v. *Moulton*, 474 U. S. 159 (1985), the defendant made incriminating statements in a meeting with his accomplice, who had agreed to cooperate with the police. During that meeting, the accomplice, who wore a wire transmitter to record the conversation, discussed with the defendant the charges pending against him, repeatedly asked the defendant to remind him of the details of the crime, and encouraged the defendant to describe his plan for killing witnesses. *Id.*, at 165–166, and n. 4. The Court concluded that these investigatory techniques denied the defendant his right to counsel on the pending charges.[21] Significantly, the Court emphasized that, because of the relationship between the defendant

---

[21] The Court observed, however, that where the defendant makes "[i]ncriminating statements pertaining to other crimes, as to which the Sixth Amendment right has not yet attached," those statements "are, of course, admissible at a trial of those offenses." 474 U. S., at 180, n. 16.

and the informant, the informant's engaging the defendant "in active conversation about their upcoming trial was certain to elicit" incriminating statements from the defendant. *Id.*, at 177, n. 13. Thus, the informant's participation "in this conversation was 'the functional equivalent of interrogation.'" *Ibid.* (quoting *United States* v. *Henry*, 447 U. S., at 277 (POWELL, J., concurring)).

As our recent examination of this Sixth Amendment issue in *Moulton* makes clear, the primary concern of the *Massiah* line of decisions is secret interrogation by investigatory techniques that are the equivalent of direct police interrogation. Since "the Sixth Amendment is not violated whenever—by luck or happenstance—the State obtains incriminating statements from the accused after the right to counsel has attached," 474 U. S., at 176, citing *United States* v. *Henry*, *supra*, at 276 (POWELL, J., concurring), a defendant does not make out a violation of that right simply by showing that an informant, either through prior arrangement or voluntarily, reported his incriminating statements to the police. Rather, the defendant must demonstrate that the police and their informant took some action, beyond merely listening, that was designed deliberately to elicit incriminating remarks.

## B

It is thus apparent that the Court of Appeals erred in concluding that respondent's right to counsel was violated under the circumstances of this case. Its error did not stem from any disagreement with the District Court over appropriate resolution of the question reserved in *Henry*, but rather from its implicit conclusion that this case did not present that open question. That conclusion was based on a fundamental mistake, namely, the Court of Appeals' failure to accord to the state trial court's factual findings the presumption of correctness expressly required by 28 U. S. C. § 2254(d). *Patton* v. *Yount*, 467 U. S. 1025 (1984); *Sumner* v. *Mata*, 449 U. S. 539 (1981).

The state court found that Officer Cullen had instructed Lee only to listen to respondent for the purpose of determining the identities of the other participants in the robbery and murder. The police already had solid evidence of respondent's participation.[22] The court further found that Lee followed those instructions, that he "at no time asked any questions" of respondent concerning the pending charges, and that he "only listened" to respondent's "spontaneous" and "unsolicited" statements. The only remark made by Lee that has any support in this record was his comment that respondent's initial version of his participation in the crimes "didn't sound too good." Without holding that any of the state court's findings were not entitled to the presumption of correctness under § 2254(d),[23] the Court of Appeals focused on that one remark and gave a description of Lee's interaction with respondent that is completely at odds with the facts found by the trial court. In the Court of Appeals' view, "[s]ubtly and slowly, but surely, Lee's ongoing verbal intercourse with [respondent] served to exacerbate [respondent's] already troubled state of mind."[24] 742 F. 2d, at 745. After thus revising some of the trial court's findings, and ignoring other more relevant findings, the Court of Appeals concluded that the police "deliberately elicited" respondent's incriminating statements. *Ibid.* This conclusion conflicts with the

---

[22] Eyewitnesses had identified respondent as the man they saw fleeing from the garage with an armful of money.

[23] The majority did not respond to Judge Van Graafeiland's criticism that the court could not "dispense with the presumption that the State court's factual findings are correct without an adequate explanation as to why the findings are not fairly supported by the record." 742 F. 2d, at 749 (citations omitted).

[24] Curiously, the Court of Appeals expressed concern that respondent was placed in a cell that overlooked the scene of his crimes. *Id.,* at 745. For all the record shows, however, that fact was sheer coincidence. Nor do we perceive any reason to require police to isolate one charged with crime so that he cannot view the scene, whatever it may be, from his cell window.

decision of every other state and federal judge who reviewed this record, and is clear error in light of the provisions and intent of § 2254(d).

V

The judgment of the Court of Appeals is reversed, and the case is remanded for further proceedings consistent with this opinion.

*It is so ordered.*

CHIEF JUSTICE BURGER, concurring.

I agree fully with the Court's opinion and judgment. This case is clearly distinguishable from *United States* v. *Henry*, 447 U. S. 264 (1980). There is a vast difference between placing an "ear" in the suspect's cell and placing a voice in the cell to encourage conversation for the "ear" to record.

Furthermore, the abuse of the Great Writ needs to be curbed so as to limit, if not put a stop to, the "sporting contest" theory of criminal justice so widely practiced today.

JUSTICE BRENNAN, with whom JUSTICE MARSHALL joins, dissenting.

Because I believe that the Court of Appeals correctly concluded that the "ends of justice" would be served by plenary consideration of respondent's second federal habeas petition and that *United States* v. *Henry*, 447 U. S. 264 (1980), directly controls the merits of this case, I dissent.

I

In *Sanders* v. *United States*, 373 U. S. 1, 15 (1963), we held that a federal court may refuse to entertain a successive petition for habeas relief or its equivalent under 28 U. S. C. § 2255 where "the ends of justice would not be served by reaching the merits of the subsequent application." The decision whether to hear a successive petition, we stated, was committed "to the sound discretion of the federal trial judges." *Id.*, at 18. We declined to define precisely "the

ends of justice," observing that the phrase "cannot be too finely particularized." *Id.*, at 17.

Today four Members of the Court argue that we should reject *Sanders'* "sound discretion" standard and contend that the ends of justice are served by reconsideration of issues raised in previous federal habeas petitions *only* where the prisoner can make a colorable showing of factual innocence.[1] *Ante*, at 454, and n. 17. In support of this standard for consideration of successive petitions, the plurality advances a revisionist theory of this Court's habeas corpus jurisprudence. The plurality implies that federal habeas review is not available as a matter of right to a prisoner who alleges in his first federal petition a properly preserved claim that his conviction was obtained in violation of constitutional commands. Rather, the plurality suggests that a prisoner is entitled to habeas relief only if his interest in freedom from unconstitutional incarceration outweighs the State's interests in the administration of its criminal laws. *Ante*, at 452–453, and nn. 14–16. The plurality further intimates that federal review of state-court convictions under 28 U. S. C. § 2254 is predicated solely on the need to prevent the incarceration of an innocent person, stating that "[d]espite [the substantial] costs [federal habeas review imposes upon the States], Congress has continued to afford federal habeas relief in appropriate cases, 'recognizing the need in a free society for an additional safeguard against compelling an innocent [person] to suffer an unconstitutional loss of liberty.'" *Ante*, at 454, n. 16 (quoting *Stone* v. *Powell*, 428 U. S. 465, 491–492, n. 31 (1976)). Having thus implied that factual innocence is central to our habeas jurisprudence generally, the plurality declares that it is fundamental to the proper interpretation of "the ends of justice." Neither the plurality's standard for

---

[1] While a majority of the Court today rejects, either implicitly or explicitly, this argument, I believe it appropriate to explain why the plurality's view is incorrect.

consideration of successive petitions nor its theory of habeas corpus is supported by statutory language, legislative history, or our precedents.[2]

---

[2] The plurality asserts, *ante*, at 455–456, n. 18, that it addresses *only* the standard applicable to successive habeas petitions and that I mischaracterize its opinion by suggesting that the dictum, contained in Part II–B of the plurality's opinion, regarding the purpose and the scope of the Great Writ has any significance. While the plurality correctly states that what would have been the holding of Part III of its opinion, had that Part commanded a Court, would have directly governed only successive petitions, methinks my Brothers and Sister protest too much about their general discussion of the writ. In order to mask the fact that it fashions its factual-innocence standard from whole cloth, the plurality attempts to justify that standard by reference to the plurality's view of "the historic purpose of habeas corpus." *Ante*, at 454; see also *ante*, at 448–452. Consequently, in order to comment upon the plurality's standard for successive petitions, I find it necessary first to address the plurality's treatment of the general scope and purposes of the Great Writ. Thus, the "first six pages of the dissent" has as much "relevance" to this case as does Part II–B of the plurality's opinion. *Ante*, at 455–456, n. 18.

The plurality further chastises me for failing to propose a precise definition of the "ends of justice" standard of *Sanders* v. *United States*, 373 U. S. 1, 15 (1963), and for adhering to *Sanders* by leaving the decision whether to hear successive petitions to the "sound discretion of the federal trial judges." *Id.*, at 18. The plurality argues that *Sanders* left open "the critical question of what considerations should inform a court's decision that successive review of an issue previously decided will serve the 'ends of justice.'" *Ante*, at 455–456, n. 18. *Sanders* did leave that question open, but in a different sense than the plurality suggests. In *Sanders*, we acknowledged that the meaning of the phrase "'the ends of justice' . . . cannot be too finely particularized," 373 U. S., at 17, and, in recognition of this fact, we left it to the "sound discretion" of federal trial judges to make case-by-case determinations of what the ends of justice require. The plurality, while purporting merely to elucidate *Sanders'* "sound discretion" standard, would replace discretion with a single legal standard—actual innocence. And, while the plurality asserts that there is a need for a more refined standard, it offers no evidence that, over the 23 years since *Sanders* was decided, federal trial courts have had difficulty applying the "sound discretion" standard or have so abused their discretion with respect to successive petitions that revision of our longstanding interpretation of § 2244(b) is warranted.

At least since the middle of this century, when we decided *Waley* v. *Johnston,* 316 U. S. 101 (1942), and *Brown* v. *Allen,* 344 U. S. 443 (1953), it has been clear that "habeas lies to inquire into every constitutional defect in any criminal trial," *Mackey* v. *United States,* 401 U. S. 667, 685–686 (1971) (opinion of Harlan, J.), that has not been procedurally defaulted, with the narrow exception of Fourth Amendment exclusionary rule claims. *Stone* v. *Powell, supra.* As we stated just two Terms ago, there is "no doubt that in enacting § 2254, Congress sought to 'interpose the federal courts between the States and the people, as guardians of the people's federal rights—to protect the people from unconstitutional action.'" *Reed* v. *Ross,* 468 U. S. 1, 10 (1984) (quoting *Mitchum* v. *Foster,* 407 U. S. 225, 242 (1972)).

Contrary to the plurality's assertions, the Court has never delineated the general scope of the writ by weighing the competing interests of the prisoner and the State. Our cases addressing the propriety of federal collateral review of constitutional error made at trial or on appeal have balanced these interests solely with respect to claims that were procedurally defaulted in state court. See, *e. g., Wainwright* v. *Sykes,* 433 U. S. 72 (1977), *Engle* v. *Isaac,* 456 U. S. 107 (1982); *Murray* v. *Carrier, post,* p. 478. Recognizing that "the State's interest in the integrity of its rules and proceedings and the finality of its judgments . . . would be undermined if the federal courts were too free to ignore procedural forfeitures in state court," *Reed* v. *Ross, supra,* at 10, we held in *Wainwright* v. *Sykes, supra,* that a state prisoner generally must show cause and actual prejudice in order to obtain federal habeas corpus relief of a procedurally defaulted claim. See also *Engle* v. *Isaac, supra.* But even as we established the cause-and-prejudice standard in *Wainwright* v. *Sykes, supra,* we emphasized that the "rule" of *Brown* v. *Allen, supra,* "that the federal habeas petitioner who claims he is detained pursuant to a final judgment of a state court in violation of the United States Constitution is entitled to have the

federal habeas court make its own independent determination of his federal claim . . . is in no way changed," by our adoption of special rules for procedurally defaulted claims. *Wainwright* v. *Sykes, supra,* at 87.[3]

Furthermore, *Stone* v. *Powell, supra,* on which the plurality heavily relies, did not establish a new regime for federal habeas corpus under which the prisoner's interests are weighed against the State's interests and under which he usually forfeits habeas review unless he can make out a colorable showing of factual innocence or unless the constitutional right he seeks to protect generally furthers the accuracy of factfinding at trial. Indeed, in *Stone* v. *Powell,* the Court expressly stated that its "decision . . . [was] *not* concerned with the scope of the habeas corpus statute as authority for litigating constitutional claims generally." *Id.,* at 495, n. 37 (emphasis in original). Rather, the Court simply "reaffirm[ed] that the exclusionary rule is a judicially created remedy rather than a personal constitutional right . . . and . . . emphasiz[ed] the minimal utility of the [exclusionary] rule" in the context of federal collateral proceedings. *Ibid.* Subsequent cases have uniformly construed *Stone* v. *Powell* as creating a special rule only for Fourth Amendment exclusionary rule claims and have repeatedly refused to extend its limitations on federal habeas review to any other context. *Kimmelman* v. *Morrison, ante,* p. 365 (declining to extend *Stone* v. *Powell* to Sixth Amendment right to effective-assistance-of-counsel claims where the principal allegation and manifestation of inadequate representation is counsel's

---

[3] In other words, we have recognized an exception to the exercise of federal jurisdiction in the unusual cases where respect for the procedures of state courts make this appropriate; such an exception is similar to abstention rules. See, *e. g., Younger* v. *Harris,* 401 U. S. 37 (1971); *Burford* v. *Sun Oil Co.,* 319 U. S. 315 (1943). However, like other judicially created exceptions to federal jurisdiction conferred by Congress, it is a narrow exception to the "virtually unflagging obligation" to exercise that jurisdiction. *Colorado River Water Conservation Dist.* v. *United States,* 424 U. S. 800, 817 (1976).

failure to litigate adequately a Fourth Amendment claim); *Rose* v. *Mitchell*, 443 U. S. 545 (1979) (declining to extend *Stone* v. *Powell* to claims of racial discrimination in the selection of grand jury foremen); *Jackson* v. *Virginia*, 443 U. S. 307 (1979) (declining to extend *Stone* v. *Powell* to claims by state prisoners that the evidence in support of their convictions was not sufficient to permit a rational trier of fact to find guilt beyond a reasonable doubt, as required under *In re Winship*, 397 U. S. 358 (1970)).

Despite the plurality's intimations, we simply have never held that federal habeas review of properly presented, nondefaulted constitutional claims is limited either to constitutional protections that advance the accuracy of the factfinding process at trial or is available solely to prisoners who can make out a colorable showing of factual innocence. On the contrary, we have stated expressly that on habeas review "what we have to deal with is not the petitioners' innocence or guilt but solely the question whether their constitutional rights have been preserved." *Moore* v. *Dempsey*, 261 U. S. 86, 87–88 (1923) (Holmes, J.). Congress has vested habeas jurisdiction in the federal courts over all cases in which the petitioner claims he has been detained "in violation of the Constitution or laws . . . of the United States," 28 U. S. C. § 2241(c)(3), and, "[t]he constitutional rights of criminal defendants are granted to the innocent and the guilty alike." *Kimmelman* v. *Morrison*, *ante*, at 380. Thus:

> "Even if punishment of the 'guilty' were society's highest value . . . in a constitution that [some] Members of this Court would prefer, that is not the ordering of priorities under the Constitution forged by the Framers . . . . Particular constitutional rights that do not affect the fairness of factfinding procedures cannot for that reason be denied at the trial itself. What possible justification then can there be for denying vindication of such rights on federal habeas when state courts do deny those rights

at trial?" *Stone* v. *Powell*, 428 U. S., at 523–525 (BREN-
NAN, J., dissenting).

The habeas statute itself certainly does not provide any jus-
tification, either for limiting the scope of habeas review gen-
erally or for narrowly defining the ends of justice to make ha-
beas relief available on a successive petition only to prisoners
who can make a colorable showing of factual innocence.

With respect to the general scope of federal habeas review,
§ 2241, which grants federal courts the statutory authority to
issue writs of habeas corpus, makes no mention of guilt and
innocence or of the need to balance the interests of the State
and the prisoner. In pertinent part, it states simply that
"[t]he writ of habeas corpus shall not extend to a prisoner
unless . . . [h]e is in custody in violation of the Constitution
or laws or treaties of the United States." 28 U. S. C.
§ 2241(c)(3). Nor does anything in the legislative history of
the habeas statute support the view that Congress intended
to limit habeas review in the manner proposed by the Court.
For more than 30 years, our construction of the habeas
statute to permit federal collateral review of virtually all
nondefaulted constitutional claims—with the narrow excep-
tion, over dissent, of Fourth Amendment claims—without
reference to actual guilt or innocence or to the competing in-
terests of the State and the prisoner, has been unmistakably
clear. See *Brown* v. *Allen*, 344 U. S. 443 (1953). Several
times during this period, Congress has had the Court's inter-
pretation expressly brought to its attention through bills pro-
posing drastic revision of federal habeas jurisdiction. See
L. Yackle, Postconviction Remedies § 19, pp. 91–92 (1981)
(describing relevant bills introduced in past several Con-
gresses). Each of those times, Congress steadfastly refused
to make any significant changes in this Court's construction
of that jurisdiction. *Id.*, § 19, at 92 ("[S]ince 1948 the only
amendments to the [habeas] statutes that the Congress
has approved have . . . simply tracked contemporaneous
Supreme Court decisions") (footnote omitted). The fact that

Congress has been made aware of our longstanding construction and has chosen to leave it undisturbed, "lends powerful support to [its] continued viability." *Square D Co.* v. *Niagara Frontier Tariff Bureau, Inc.*, 476 U. S. 409, 419 (1986).

With regard to the specific question whether factual innocence is a precondition for review of a successive habeas petition, neither § 2244(b)—which governs applications for writs of habeas corpus to state courts that are filed subsequent to the disposition of a prior federal habeas petition, its legislative history, nor the Rules Governing Section 2254 Cases in the United States District Courts (hereafter Rules Governing Section 2254), support the plurality's position. Section 2244(b), as amended in 1966, states in relevant part that a subsequent petition "*need not be entertained* . . . unless the application alleges and is predicated on a factual or other ground not adjudicated on the hearing of the earlier application for the writ, and unless the court . . . is satisfied that the applicant has not on the earlier application deliberately withheld the newly asserted ground or otherwise abused the writ." (Emphasis added.) By its very terms, then, § 2244(b) merely informs district courts that they *need not* consider successive petitions; that is, the statute gives district courts the *discretion* not to hear such petitions. Similarly, Rule 9(b) of the Rules Governing Section 2254, which were adopted in 1976, states that a "second or successive petition *may* be dismissed if the judge finds that it fails to allege new or different grounds for relief and the prior determination was on the merits or, if new and different grounds are alleged, the judge finds that the failure of the petitioner to assert those grounds in a prior petition constituted an abuse of the writ." (Emphasis added.)

Congress clearly intended that courts continue to determine which successive petitions they may choose not to hear by reference to the *Sanders* ends-of-justice standard. First, nothing in the House or Senate Reports accompanying the bill that amended § 2244 in 1966 suggests that Congress

wished to abandon the *Sanders* standard. See H. R. Rep. No. 1892, 89th Cong., 2d Sess. (1966); S. Rep. No. 1797, 89th Cong., 2d Sess. (1966). Second, the legislative history of the Rules Governing Section 2254 demonstrates that in adopting Rule 9(b) Congress expressly endorsed the existing case law governing subsequent petitions and cited *Sanders*.[4] H. R. Rep. No. 94-1471, pp. 5-6 (1976). Third, the Advisory Committee's Notes relating to Rule 9(b) state that *Sanders* provides the relevant standards for subsequent petitions and indicate that the district courts have the discretion to refuse to entertain vexatious and meritless subsequent petitions:

> "In *Sanders* v. *United States*, 373 U. S. 1 (1963), the court, in dealing with the problem of successive applications, stated:
>
> "'Controlling weight *may* be given to denial of a prior application for federal habeas corpus or § 2255 relief only if (1) the same ground presented in the subsequent application was determined adversely to the applicant on the prior application, (2) the prior determination was on the merits, and (3) the ends of justice would not be served by reaching the merits of the subsequent application.' [Emphasis added]."

> .        .        .        .        .

> "*Sanders*, [28] U. S. C. § 2244, and [Rule 9(b)] make it clear that the court has the discretion to entertain a successive application.

> .        .        .        .        .

> "Subdivision (b) is consistent with the important and well established purpose of habeas corpus. It does not

---

[4] While the discussion in the House Report regarding Rule 9(b) focuses on that portion of the Rule that governs abuse of the writ, rather than petitions that repeatedly allege the same claims, it is clear that the Committee intended Rule 9(b) to conform in its entirety to existing case law, particularly to *Sanders* v. *United States*. See H. R. Rep. No. 94-1471, pp. 5-6 (1976).

eliminate a remedy to which the petitioner is rightfully entitled. However, in *Sanders*, the court pointed out:

" 'Nothing in the traditions of habeas corpus requires the federal courts to tolerate needless piecemeal litigation, or to entertain collateral proceedings whose only purpose is to vex, harass, or delay.' 373 U. S. at 18.

". . . In rare instances, the court may feel a need to entertain a petition alleging grounds that have already been decided on the merits. *Sanders*, 373 U. S. at 1, 16. However, abusive use of the writ should be discouraged, and instances of abuse are frequent enough to require a means of dealing with them. For example, a successive application, already decided on the merits, may be submitted in the hope of getting before a different judge in multijudge courts. . . . This subdivision is aimed at screening out the abusive petitions . . . so that the more meritorious petitions can get quicker and fuller consideration." 28 U. S. C., p. 358.

The Advisory Committee gave no indication that the problem Rule 9(b), or § 2244(b), seeks to correct is that of a *guilty* prisoner seeking repeated federal review of the same constitutional claim. Rather, it is apparent that the Rule attempts to remedy only the problem posed by vexatious and meritless subsequent petitions. The Committee explicitly contemplated, though, that nonabusive, "meritorious [subsequent] petitions" would receive "ful[l] consideration." *Ibid.*

When we review habeas cases, our task is "to give fair effect to the habeas corpus jurisdiction enacted by Congress." *Brown* v. *Allen*, 344 U. S., at 500 (opinion of Frankfurter, J.). With respect to successive habeas petitions, giving "fair effect" to the intent of Congress is to construe "the ends of justice" as *Sanders* did—to mean that it is within the sound discretion of the court *to refuse to hear* abusive, meritless petitions and *to hear* petitions in which the prisoner advances a potentially meritorious claim and provides a good justifi-

cation for returning to court a second time with the same claim.[5]

In the instant case, respondent alleged a potentially meritorious Sixth Amendment claim. He also advanced a complete justification for returning to federal court a second time with this claim. Between his first and second federal habeas petitions, this Court decided *United States* v. *Henry*, 447 U. S. 264 (1980), a case in which the facts were substantially similar to the facts of respondent's case[6] and in which we elaborated on the Sixth Amendment's prohibition against government interference with an accused's right to counsel, a prohibition that we had previously recognized in *Massiah* v. *United States*, 377 U. S. 201 (1964), and *Brewer* v. *Williams*, 430 U. S. 387 (1977). The intervention of *Henry*, *supra*, clarified the appropriate analysis for Sixth Amendment claims like respondent's; thus the Court of Appeals did not abuse its discretion by granting reconsideration of respondent's constitutional claim under the dispositive legal standard.[7]

---

[5] I agree with the plurality that actual innocence constitutes a sufficient justification for returning to court a second time with the same claim. I do not agree, though, that a prisoner's inability to make a showing of actual innocence negates an otherwise good justification, such as respondent's.

[6] The facts of this case demonstrate the arbitrariness of the Court's rule. The initial federal habeas petitions filed by respondent and by Henry presented virtually identical claims. Because our decision in *United States* v. *Henry* may have altered the law of the Circuit in which respondent's prior petition failed, it is only just that respondent's claim be reviewed under the proper constitutional standards.

[7] The plurality's factual-innocence standard also presents some significant institutional problems. First, this standard requires the federal courts to function in much the same capacity as the state trier of fact—the federal courts must make a rough decision on the question of guilt or innocence. This requirement diverts the federal courts from the central purpose of habeas review—the evaluation of claims that convictions were obtained in violation of the Constitution. Second, it is unclear what relevance the plurality's standard would have in a case in which a prisoner alleges constitutional error in the sentencing phase of a capital case. Guilt

## II

The Court holds that the Court of Appeals erred with respect to the merits of respondent's habeas petition. According to the Court, the Court of Appeals failed to accord § 2254(d)'s presumption of correctness to the state trial court's findings that respondent's cellmate, Lee, "at no time asked any questions" of respondent concerning the pending charges, and that Lee only listened to respondent's "spontaneous" and "unsolicited" statements, App. 62–63. As a result, the Court concludes, the Court of Appeals failed to recognize that this case presents the question, reserved in *Henry, supra,* whether the Sixth Amendment forbids the admission into evidence of an accused's statements to a jailhouse informant who was "placed in close proximity but [made] no effort to stimulate conversations about the crime charged." *Id.,* at 271, n. 9. I disagree with the Court's characterization of the Court of Appeals' treatment of the state court's findings and, consequently, I disagree with the Court that the instant case presents the "listening post" question.

The state trial court simply found that Lee did not ask respondent any direct questions about the crime for which respondent was incarcerated. App. 62–63. The trial court considered the significance of this fact only under state precedents, which the court interpreted to require affirmative "interrogation" by the informant as a prerequisite to a constitutional violation. *Id.,* at 63. The court did not indicate whether it referred to a Fifth Amendment or to a Sixth Amendment violation in identifying "interrogation" as a precondition to a violation; it merely stated that "the utterances made by [respondent] to Lee were unsolicited, and volun-

or innocence is irrelevant in that context; rather, there is only a decision made by representatives of the community whether the prisoner shall live or die. Presumably, then, the plurality's test would not be applicable to such claims.

tarily made and did not violate the defendant's Constitutional rights." *Ibid.*

The Court of Appeals did not disregard the state court's finding that Lee asked respondent no direct questions regarding the crime. Rather, the Court of Appeals *expressly accepted* that finding, *Wilson* v. *Henderson,* 742 F. 2d 741, 745 (CA2 1984) ("[e]ven accepting that Lee did not ask Wilson any direct questions . . ."), but concluded that, as a matter of law, the deliberate elicitation standard of *Henry,* *supra,* and *Massiah, supra,* encompasses other, more subtle forms of stimulating incriminating admissions than overt questioning. The court suggested that the police deliberately placed respondent in a cell that overlooked the scene of the crime, hoping that the view would trigger an inculpatory comment to respondent's cellmate.[8] The court also observed that, while Lee asked respondent no questions, Lee nonetheless stimulated conversation concerning respondents' role in the Star Taxicab Garage robbery and murder by remarking that respondent's exculpatory story did not "'sound too good'" and that he had better come up with a better one. 742 F. 2d, at 745. Thus, the Court of Appeals concluded that respondent's case did not present the situation reserved in *Henry,* where an accused makes an incriminating remark within the hearing of a jailhouse informant, who "makes no effort to stimulate conversations about the crime charged." 447 U. S., at 271, n. 9. Instead, the court determined this case to be virtually indistinguishable from *Henry.*

The Sixth Amendment guarantees an accused, at least after the initiation of formal charges, the right to rely on counsel as the "medium" between himself and the State. *Maine* v. *Moulton,* 474 U. S. 159, 176 (1985). Accordingly, the Sixth Amendment "imposes on the State an affirmative obligation to respect and preserve the accused's choice to

---

[8] The Court of Appeals noted that "[a]s soon as Wilson arrived and viewed the garage, he became upset and stated that 'someone's messing with me.'" 742 F. 2d, at 745.

seek [the assistance of counsel]," *id.*, at 171, and therefore "[t]he determination whether particular action by state agents violates the accused's right to . . . counsel must be made in light of this obligation." *Id.*, at 176. To be sure, the Sixth Amendment is not violated whenever, "by luck or happenstance," the State obtains incriminating statements from the accused after the right to counsel has attached. It is violated, however, when "the State obtains incriminating statements by knowingly circumventing the accused's right to have counsel present in a confrontation between the accused and a state agent." *Ibid.* (footnote omitted). As we explained in *Henry*, where the accused has not waived his right to counsel, the government knowingly circumvents the defendant's right to counsel where it "deliberately elicit[s]" inculpatory admissions, 447 U. S., at 270, that is, "intentionally creat[es] a situation likely to induce [the accused] to make incriminating statements without the assistance of counsel." *Id.*, at 274.

In *Henry*, we found that the Federal Government had "deliberately elicited" incriminating statements from Henry based on the following circumstances. The jailhouse informant, Nichols, had apparently followed instructions to obtain information without directly questioning Henry and without initiating conversations concerning the charges pending against Henry. We rejected the Government's argument that because Henry initiated the discussion of his crime, no Sixth Amendment violation had occurred. We pointed out that under *Massiah* v. *United States*, 377 U. S. 201 (1964), it is irrelevant whether the informant asks pointed questions about the crime or "merely engage[s] in general conversation about it." 447 U. S., at 271–272, and n. 10. Nichols, we noted, "was not a passive listener; . . . he had 'some conversations with Mr. Henry' while he was in jail and Henry's incriminatory statements were 'the product of this conversation.'" *Id.*, at 271.

In deciding that Nichols' role in these conversations amounted to deliberate elicitation, we also found three other factors important. First, Nichols was to be paid for any information he produced and thus had an incentive to extract inculpatory admissions from Henry. *Id.*, at 270. Second, Henry was not aware that Nichols was acting as an informant. *Ibid.* "Conversation stimulated in such circumstances," we observed, "may elicit information that an accused would not intentionally reveal to persons known to be Government agents." *Id.*, at 273. Third, Henry was in custody at the time he spoke with Nichols. This last fact is significant, we stated, because "custody imposes pressures on the accused [and] confinement may bring into play subtle influences that will make him particularly susceptible to the ploys of undercover Government agents." *Id.*, at 274. We concluded that by "intentionally creating a situation likely to induce Henry to make incriminating statements without the assistance of counsel, the Government violated Henry's Sixth Amendment right to counsel." *Ibid.* (footnote omitted).

In the instant case, as in *Henry*, the accused was incarcerated and therefore was "susceptible to the ploys of undercover Government agents." *Ibid.* Like Nichols, Lee was a secret informant, usually received consideration for the services he rendered the police, and therefore had an incentive to produce the information which he knew the police hoped to obtain. Just as Nichols had done, Lee obeyed instructions not to question respondent and to report to the police any statements made by the respondent in Lee's presence about the crime in question. App. 62. And, like Nichols, Lee encouraged respondent to talk about his crime by conversing with him on the subject over the course of several days and by telling respondent that his exculpatory story would not convince anyone without more work. However, unlike the situation in *Henry*, a disturbing visit from respondent's brother, rather than a conversation with the informant, seems to have been the immediate catalyst for respondent's

confession to Lee. *Ante*, at 440; *Wilson* v. *Henderson*, 82 Civ. 4397 (SDNY, Mar. 30, 1983), App. to Pet. for Cert. 25a–26a. While it might appear from this sequence of events that Lee's comment regarding respondent's story and his general willingness to converse with respondent about the crime were not the *immediate* causes of respondent's admission, I think that the deliberate-elicitation standard requires consideration of the entire course of government behavior.

The State intentionally created a situation in which it was forseeable that respondent would make incriminating statements without the assistance of counsel, *Henry*, 447 U. S., at 274—it assigned respondent to a cell overlooking the scene of the crime and designated a secret informant to be respondent's cellmate. The informant, while avoiding direct questions, nonetheless developed a relationship of cellmate camaraderie with respondent and encouraged him to talk about his crime. While the *coup de grace* was delivered by respondent's brother, the groundwork for respondent's confession was laid by the State. Clearly the State's actions had a sufficient nexus with respondent's admission of guilt to constitute deliberate elicitation within the meaning of *Henry*. I would affirm the judgment of the Court of Appeals.

JUSTICE STEVENS, dissenting.

When a district court is confronted with the question whether the "ends of justice" would be served by entertaining a state prisoner's petition for habeas corpus raising a claim that has been rejected on a prior federal petition for the same relief, one of the facts that may properly be considered is whether the petitioner has advanced a "colorable claim of innocence." But I agree with JUSTICE BRENNAN that this is not an essential element of every just disposition of a successive petition. More specifically, I believe that the District Court did not abuse its discretion in entertaining the petition in this case, although I would also conclude that this is one of those close cases in which the District Court could have properly decided that a second review of the same contention was

not required despite the intervening decision in *United States v. Henry*, 447 U. S. 264 (1980).

On the merits, I agree with the analysis in Part II of JUSTICE BRENNAN's dissent. Accordingly, I also would affirm the judgment of the Court of Appeals.