**Aurelio Valentino LEBRON, Petitioner,**

v.

**Louis F. MANN, Superintendent,
Shawangunk Correctional
Facility, Respondent.**

**No. CV–90–4150 (JBW).**

United States District Court,
E.D. New York.

March 7, 1994.

Norman Trabulus, Mineola, NY, for petitioner.

Charles J. Hynes, Dist. Atty., Kings County by Ann Bordley, Brooklyn, NY, for respondent.

*MEMORANDUM AND ORDER*

WEINSTEIN, Senior District Judge:

Petitioner seeks a writ of habeas corpus on the ground of inadequacy of counsel. His trial attorney failed to present to the jury a theory of defense against a robbery by the deceased that provides a rule of law theoretically less onerous to the defendant than that of self-defense from an attack. Distinguished present appointed defense counsel has made a clear case for petitioner on academic grounds. Nevertheless, that a different defense concept of the law would have changed the jury's view of the matter seems so remote as to require, under current law, dismissal of the petition.

## I. FACTS

Shortly before 6:00 p.m. on January 24, 1982, Aurelio Lebron, the petitioner, and Johnny Lopez were inside the apartment of Secundina Arvello, Lebron's common-law wife, on Willoughby Street in Brooklyn. Lopez had come to collect a debt from Lebron. The two argued. During the dispute, Lebron produced a sawed-off shotgun. He fired once, causing immediate death. Lebron told Arvello to call the police. Having admitted to the arresting officer that he had shot Lopez, he was charged with Murder in the Second Degree (N.Y.Penal Law § 125.-25(1)) and Criminal Possession of a Weapon in the Second Degree (N.Y.Penal Law § 265.03).

### A. The Pre–Trial Hearing

Pursuant to Lebron's motion to suppress his admission to the police and the physical evidence recovered at the crime scene, a

suppression hearing was held in December, 1982. Police Officer Ernest Graham, the first officer to reach the crime scene, testified that when Lebron answered the door, he asked Lebron what had happened. Lebron replied, "We had an argument. I shot him, and I don't want to talk anymore." Inside, Officer Graham observed Lopez' body lying face down on the floor along with a shotgun. Officer Graham then placed Lebron under arrest.

The next person to arrive on the scene was Detective George Rice. He testified that after he observed the body, the owner of the apartment, Secundina Arvello, permitted him to search the apartment. Detective Rice then took Lebron to the stationhouse.

Defense counsel chose not to cross-examine Officer Graham and only asked to see Detective Rice's notebook. The prosecutor advised the court that he intended to offer as evidence at trial Lebron's statement to Officer Graham and the shotgun. Defense counsel saw no reason to object, and the court agreed that they were admissible.

The prosecutor then advised the court that Lebron had also made a statement to Police Officer Nieves at the stationhouse, but that he had no intention of using it in the People's case-in-chief since it was suppressible. When defense counsel inquired whether the prosecutor planned to use the statement for cross-examination purposes, the prosecutor stated that this was a "possibility."

## B. The Trial

The People's case consisted of the testimony of five witnesses: Secundina Arvello, Officer Graham, Detective Rice, Officer Michael Albanese (a ballistics expert), and Dr. Carlos Eliazo (an associate medical examiner).

Arvello testified that some time after 2:00 p.m. on January 24, 1982, she was awakened by noises in the kitchen. She heard an unfamiliar male voice say that he "didn't care to kill or die" and that he had shot a man with a shotgun before. The voice also said, "remember you have a wife and daughter" and that Lebron owed him money. She then heard Lebron say that the man was "putting things on him that he didn't do." She then

heard a "blast", and when she looked into the kitchen, Lebron told her to call the police.

The testimony of Officer Graham and Detective Rice was substantially identical to their hearing testimony. Detective Rice added, however, that when he rolled Lopez' body over, no weapons were visible from the outside. Only after unzipping three jackets and a vest did the Detective find a sheathed hunting knife and a sawed-off shotgun in the deceased's waistband.

No witnesses were called on behalf of the defense. Defense counsel stated that after discussions with Lebron, Lebron had decided that he did not wish to testify on his own behalf.

In his summation, defense counsel argued that based on the testimony of the prosecution's witnesses, the jury could reasonably conclude that Lopez had threatened to kill Lebron and that Lopez had the means to carry out the threat at hand. Counsel further argued that one could rationally infer that Lopez revealed his weapons to Lebron and that the observation of these weapons coupled with the verbal threats on Lebron's life justified Lebron's actions as an act of self-defense in the face of the threat of imminent deadly physical force.

The prosecutor, in summation, commented on Secundina Arvello's reluctance to testify against her common-law husband and on her crying when she first took the stand. He asked the jury to keep in mind Arvello's bias in favor of Lebron in assessing her credibility. The prosecutor also pointed out that Lebron's sawed-off shotgun was illegal since it had a defaced serial number and that such a weapon is easily concealed, cannot be traced, and is designed for use against people. He argued that the following scenario could reasonably be inferred: 1) the murder weapon was kept unassembled in the apartment, 2) after Arvello went to sleep, Lebron removed it from its storage place under the cushions of a sofa and assembled it, and 3) Lebron, who was "armed and waiting", concealed the weapon while arguing with Lopez, and then pulled it out quickly and fired.

The indicted charges of Murder in the Second Degree and Criminal Possession in

the Second Degree were submitted to the jury as well as charges for the following lesser included offenses: Manslaughter in the First Degree, Manslaughter in the Second Degree, and Criminal Possession of a Weapon in the Third and Fourth Degrees. The court also explained the defenses of extreme emotional disturbance and self-defense justification against the threat of deadly force.

The jury found Lebron guilty of Murder in the Second Degree. In accordance with the trial court's instructions, no verdict was returned on the weapons possession charge. In January of 1983, Lebron was sentenced to a term of imprisonment of twenty years to life. His brief in the Appellate Division raised the following two claims:

1) Prosecutorial misconduct during summation deprived him of a fair trial as guaranteed by the state and federal constitutions; and

2) He was denied effective assistance of trial counsel.

The Appellate Division unanimously affirmed the judgment of conviction in a memorandum decision. *People v. Lebron,* 114 A.D.2d 859, 494 N.Y.S.2d 766 (2d Dep't 1985). Permission to appeal was sought and denied. *People v. Lebron,* 66 N.Y.2d 1041, 499 N.Y.S.2d 1038, 489 N.E.2d 1310 (1985).

In his current habeas petition, Lebron raises the same two claims that he raised on direct appeal in the Appellate Division. An aspect of the ineffective assistance of counsel claim is clearly articulated for the first time.

## II. LAW

### A. Robbery Under New York Law

Under New York law, the crime of robbery requires an "immediate use" or threatened immediate use of "physical force." N.Y.Penal Law § 160.00. Such a threat of the immediate use of force may be accomplished through words which, in and of themselves, do not express immediacy. *People v. Woods,* 41 N.Y.2d 279, 392 N.Y.S.2d 400, 360 N.E.2d 1082 (1977). "The [robbery] statute does not require the use of any words whatsoever, but merely that there be a threat, whatever its nature, of the immediate use of

physical force." *Id.* at 283, 392 N.Y.S.2d at 402, 360 N.E.2d at 1084. A claim of right, such as collection of a debt, is not a defense to attempted robbery. *People v. Reid,* 69 N.Y.2d 469, 515 N.Y.S.2d 750, 508 N.E.2d 661 (1987); *People v. Coates,* 64 A.D.2d 1, 407 N.Y.S.2d 866 (2d Dep't 1978); *People v. Hodges,* 113 A.D.2d 514, 496 N.Y.S.2d 771 (2d Dep't 1985).

### B. Defense Justifications Under New York Law

The New York Penal Law sets forth the circumstances under which the use of physical force and deadly physical force may be justified in defense of a person. N.Y.Penal Law § 35.15. Subdivision 2(a) allows the use of deadly force in self-defense against a "reasonably" perceived threat of imminent use of "deadly physical force." N.Y.Penal Law § 35.15(2)(a). Retreat in "his dwelling" is not required. N.Y.Penal Law § 35.-15(2)(a)(i). Subdivision 2(b) allows deadly force to be used even in the absence of a threat of deadly force as a defense against certain serious crimes, including robbery. N.Y.Penal Law § 35.15(2)(b). Since, under New York law the crime of robbery requires an immediate use or threatened immediate use of physical force, N.Y.Penal Law § 160.-00, even a justification claim based on Subdivision 2(b) requires that the defendant perceive a threat of the immediate use of physical force, albeit not necessarily of the deadly variety.

New York courts have acknowledged that these two types of justifications are independent of each other and that, when the issue of justification is central to the case, it is reversible error to give a justification instruction which treats these two theories as one. *People v. Coleman,* 122 A.D.2d 568, 504 N.Y.S.2d 949 (4th Dep't 1986) (use of deadly force to defend against attempted forcible sodomy).

### C. Habeas Corpus—Exhaustion of Remedies, Procedural Bar, and the Actual Innocence Exception

The doctrine of "exhaustion of state remedies" requires that federal habeas cor-

pus petitioners adequately present their claims to the state courts before seeking relief from the federal courts. *See, e.g., Picard v. Connor*, 404 U.S. 270, 275, 92 S.Ct. 509, 512, 30 L.Ed.2d 438 (1971).

> In order to have fairly presented his federal claim to the state courts the petitioner must have informed the state court of both the factual and the legal premises of the claim he asserts in federal court. Specifically, he must have set forth in state court all of the essential factual allegations asserted in his federal petition; if material factual allegations were omitted, the state court has not had a fair opportunity to rule on the claim.

*Daye v. Attorney General*, 696 F.2d 186, 191 (2d Cir.1982) (citations omitted), *cert. denied*, 464 U.S. 1048, 104 S.Ct. 723, 79 L.Ed.2d 184 (1984).

■ When a state prisoner fails to present a claim in state court, and any future attempt to exhaust the claim would be denied on state procedural grounds, the federal court is instructed to deny the claim on the ground that it is procedurally barred. *Coleman v. Thompson*, 501 U.S. 722, —— n. 1, 111 S.Ct. 2546, 2557 n. 1, 115 L.Ed.2d 640 (1991); *see also Grey v. Hoke*, 933 F.2d 117 (2d Cir. 1991); *Gatto v. Hoke*, 809 F.Supp. 1030, 1035–36 (E.D.N.Y.), *aff'd*, 986 F.2d 500 (2d Cir.1992). One such door-closing "state procedural ground" in New York occurs when a party unjustifiably fails to raise a particular issue on appeal and it is clear that sufficient facts appeared on the trial record to have permitted adequate review of the issue on appeal. N.Y.Crim.Proc.Law § 440.10(2)(c).

■ A federal court may overlook a prisoner's state procedural default in two circumstances: (1) if the prisoner establishes cause for the procedural default and resulting prejudice ("cause and prejudice"); or (2) if the prisoner establishes, "in an extraordinary case", that the "constitutional violation has probably resulted in the conviction of one who is actually innocent." *Murray v. Carrier*, 477 U.S. 478, 496, 106 S.Ct. 2639, 2649, 91 L.Ed.2d 397 (1986). *See also, Sawyer v. Whitley*, —— U.S. ——, —— – —— & n. 5 and 6, 112 S.Ct. 2514, 2518–19 & n. 5 and 6, 120 L.Ed.2d 269 (1992); *Gonzalez v. Sulli-*

*van*, 934 F.2d 419, 424 (2d Cir.1991) (Oakes, J., concurring) ("What a marvelous Catch–22 the law of federal habeas corpus now is!"). The "actual innocence" exception "is not itself a constitutional claim, but instead a gateway through which a habeas petitioner must pass to have his otherwise barred constitutional claim considered on the merits." *Herrera v. Collins*, —— U.S. ——, ——, 113 S.Ct. 853, 862, 122 L.Ed.2d 203 (1993). In order to support a claim of "actual innocence",

> the prisoner must "show a fair probability that, in light of all the evidence, including that alleged to have been illegally admitted (but with due regard to any unreliability of it) and evidence tenably claimed to have been wrongly excluded or to have become available only after the trial, the trier of the facts would have entertained a reasonable doubt of his guilt."

*Kuhlmann v. Wilson*, 477 U.S. 436, 455, n. 17, 106 S.Ct. 2616, 2628, n. 17, 91 L.Ed.2d 364 (1986), quoting Friendly, Is Innocence Irrelevant? Collateral Attack on Criminal Judgments, 38 U.Chi.L.Rev. 142, 160 (1970).

### D. Ineffective Assistance of Counsel

■ To prevail on a claim of ineffective assistance of trial counsel, a convicted defendant must establish: (1) that "counsel's representation fell below an objective standard of reasonableness" and (2) that "there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." *Strickland v. Washington*, 466 U.S. 668, 688, 694, 104 S.Ct. 2052, 2065, 2068, 80 L.Ed.2d 674 (1984). A "mechanical" rule is not provided; "the ultimate focus of inquiry must be on the fundamental fairness of the proceeding whose result is being challenged." *Id.* at 697, 104 S.Ct. at 2069. A single, serious error alone can be sufficient grounds for an ineffectiveness claim. *United States v. Cronic*, 466 U.S. 648, 657, n. 20, 104 S.Ct. 2039, 2046, n. 20, 80 L.Ed.2d 657 (1984).

On a collateral attack, second guessing of trial strategy is discouraged.

> Judicial scrutiny of counsel's performance must be highly deferential.... A fair assessment of attorney performance requires

that every effort be made to eliminate the distorting effects of hindsight, to reconstruct the circumstances of counsel's challenged conduct, and to evaluate from counsel's perspective at the time. Because of the difficulties inherent in making the evaluation, a court must indulge a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance; that is, the defendant must overcome the presumption that, under the circumstances, the challenged action might be considered sound trial strategy.

*Strickland,* 466 U.S. at 689, 104 S.Ct. at 2065. *See also Kimmelman v. Morrison,* 477 U.S. 365, 382, 106 S.Ct. 2574, 2586, 91 L.Ed.2d 305 (1986) (*"Strickland's* standard, although by no means insurmountable, is highly demanding.").

## III. APPLICATION OF FACTS TO LAW

### A. The Original Ineffective Assistance of Counsel Claim

Lebron did raise an ineffective assistance of counsel claim in the Appellate Division. It consisted of a long list of trial counsel's alleged failings. The examples of what he considered to be the flawed tactics of trial counsel were: First, at the suppression hearing, defense counsel (1) asked no questions of Officer Graham and only asked to see Detective Rice's notebook. Subsequently, at trial, he: (2) failed to elicit from Arvello testimony similar to her grand jury testimony and other statements which contained additional details supporting the robbery defense, (3) failed to draw testimony from Arvello stating that Lebron's shotgun was actually kept in her apartment for safety, (4) failed to have Arvello suggest that Lebron had retreated into another room before shooting Lopez, (5) failed to show that the voluntary disclosure form prepared by the prosecution for the trial detailing Lebron's confession used the word "fight" instead of "argument" and that Lebron's poor English could have influenced what Officer Graham wrote down, and (6) failed to emphasize the inference that Lopez and Lebron were very close to each other when the shooting occurred, which might have further supported Lebron's claim of defense against threatened force; during summations, defense counsel (7) argued that Lopez actually lifted his numerous jackets to expose the gun to Lebron, (8) never reminded the jury that the prosecution had the burden of disproving the justification defense beyond a reasonable doubt, and (9) did not object to the alleged confusing nature of the jury instructions.

The Appellate Division ruled that these claims "failed to demonstrate a deprivation of his [Lebron's] right to the effective assistance of counsel" under the appropriate standard. *People v. Lebron,* 114 A.D.2d 859, 494 N.Y.S.2d 766, 767 (2d Dep't 1985). Since Lebron was denied permission to appeal further on these grounds, *People v. Lebron,* 66 N.Y.2d 1041, 499 N.Y.S.2d 1038, 489 N.E.2d 1310 (1985), he has exhausted his state remedies in regard to the original ineffective assistance of counsel claim.

In response to these suggestions of ineffectiveness, the respondent in the instant proceeding argues that several of trial counsel's tactics and strategies show that he did provide effective assistance. Specifically, he: (1) obtained a pre-trial suppression hearing, (2) extensively cross-examined the prosecution's witnesses, (3) raised the possibilities that Lebron was acting in self-defense or that he was suffering from extreme emotional disturbance, (4) questioned the police officers about the location of Lopez' weapons, (5) suggested to the jury that Lopez might have shown his weapons to Lebron, (6) questioned Detective Rice about an overturned table found at the crime scene, indicating a struggle, (7) asked Arvello to describe the argument between Lopez and Lebron in detail, (8) elicited from Arvello that she heard Lopez say that he "had shot a man time back", (9) attempted to raise doubt as to whether the gun that was found near Lopez' body was the gun Lebron had brought to the house two weeks earlier, (10) reminded the jury that Lopez had ingested drugs sometime before his death, (11) emphasized that Lebron called the police, admitted them into the apartment, and did not attempt to hide the gun or the body, (12) discussed with Lebron whether or not he should testify on his own behalf, (13) asked the court to submit three lesser included offenses on the murder count and two lesser

included offenses on the weapons count, (14) asked the court to charge the jury on self-defense and extreme emotional disturbance, (15) requested an instruction that the jury not make unfavorable inferences from Lebron's failure to take the stand, (16) provided a clear and concise summation in which he reviewed the evidence and argued that there was a reasonable doubt as to Lebron's guilt, (17) moved to set aside the verdict, and (18) urged the court to exercise leniency at sentencing.

Upon review of these exhaustive lists, it seems that Lebron's examples of trial counsel's ineffectiveness are merely critiques of trial strategy supported by hindsight. The alleged errors presented to the Appellate Division are insufficient to meet the "highly demanding" standards of the two prong *Strickland* test. In *Kimmelman*, 477 U.S. 365, 106 S.Ct. 2574, 91 L.Ed.2d 305 (1986), an ineffectiveness of counsel claim was upheld only because trial counsel totally neglected to conduct pre-trial discovery and therefore was unaware of physical evidence that the police had seized until the first day of trial, and that he had failed to make a timely motion to suppress. In *Mason v. Scully*, 16 F.3d 38 (2d Cir.1994), an ineffectiveness of counsel claim was upheld only because counsel repeatedly failed to object to the admission of the hearsay statements of nontestifying codefendants where counsel was the one who initially informed the court of the Confrontation Clause problem and where it was clear that these statements decisively influenced the jury's verdict.

 Omissions of a smaller magnitude do not pass the *Strickland* standard. In *Mills v. Scully*, 826 F.2d 1192 (2d Cir.1987), for example, the court held that failure to elicit a witness' prior conflicting grand jury testimony on cross-examination was sound trial strategy. *United States v. Nersesian*, 824 F.2d 1294 (2d Cir.), *cert. denied*, 484 U.S. 957, 108 S.Ct. 355, 98 L.Ed.2d 380, *and cert. denied*, 484 U.S. 958, 108 S.Ct. 357, 98 L.Ed.2d 382 (1987), *and cert. denied*, 484 U.S. 1061, 108 S.Ct. 1018, 98 L.Ed.2d 983 (1988), a federal prosecution, held on direct appeal that decisions whether to call any witnesses on behalf of the defendant, whom

to call as witnesses, whether to engage in cross-examination, and to what extent and in what manner to cross-examine, are all strategic in nature. If these decisions are reasonably made, they cannot constitute a basis for a successful ineffectiveness claim. In *Gatto v. Hoke*, 809 F.Supp. 1030 (E.D.N.Y.1992), the court ruled that trial counsel's failure to object to the prosecutor's summation represented a tactical decision not to call attention to the prosecutor's statements and was not an example of ineffectiveness. In *Player v. Berry*, 785 F.Supp. 339 (E.D.N.Y.1992), the court ruled that defense counsel's failure to object to jury charges and request expanded charges was not ineffective assistance. Finally, in *Ballard v. Walker*, 772 F.Supp. 1335 (E.D.N.Y.1991), the court ruled that defense counsel's failure to make an opening statement, request a *Sandoval* hearing, present witnesses, object to the prosecutor's closing statement, and object to the court's jury charge did not amount to ineffectiveness of counsel. Similarly, in the present case, Lebron's list of examples of trial counsel's ineffectiveness do not amount in totality to a deprivation of his Sixth Amendment right to counsel since all of the claims relate to trial strategy.

Finally, Lebron argues that counsel's assistance at the suppression hearing was inadequate since he did not aggressively pursue Lebron's suppression motion. He questioned neither Officer Graham nor Detective Rice and only asked to see Rice's notebook. Then, at the conference following the suppression hearing, trial counsel did not request an additional hearing to determine whether Lebron's statement to Officer Nieves could even be used for cross-examination purposes since perhaps it was coerced. These examples of inactivity related to the Fourth Amendment suppression issue, however, seem to fall short of the *Strickland* test and of the additional requirement set forth in *Kimmelman*.

The Second Circuit has held in several cases that failure to make a suppression motion for which there is no legal basis is not indicative of ineffective assistance of counsel. *See United States v. Torres*, 845 F.2d 1165, 1172 (2d Cir.1988); *United States v. DiTom-*

*maso,* 817 F.2d 201, 215 (2d Cir.1987) ("We are understandably reluctant to require defense counsel routinely to file boilerplate motions merely to vindicate their professional competence without regard for the grounds supporting such motions."); *United States v. Caputo,* 808 F.2d 963 (2d Cir.1987). In the present case, there was no legal basis to suppress Lebron's statement to Officer Graham at the scene. There was no evidence that the statement had been coerced, and, because Lebron was not in custody, there was no need to give *Miranda* warnings. Since the statement to Officer Nieves at the stationhouse was suppressible and could only probably be used for cross-examination, if trial counsel knew that Lebron was not going to testify or decided that there was nothing impeaching in the statement to Nieves, there was no reason to request another suppression hearing.

### B. The New Ineffective Assistance of Counsel Claim

Lebron now argues that there is an additional aspect of the ineffective assistance of counsel claim—namely, that trial counsel failed to develop a justification defense for Lebron based on N.Y.Penal Law § 35.-15(2)(b) (use of deadly physical force in response to the threat of physical force and a robbery). Lebron contends that trial counsel was objectively remiss for failing to develop this defense and that had this defense been presented to the jury Lebron would have been acquitted.

Since this specific illustration of trial counsel deficiency was not clearly presented to the Appellate Division, it could be argued that it is a procedurally barred claim and may not be used in support of a federal habeas petition. Lebron, however, presents two reasons to explain why this claim is not procedurally barred: (1) The prosecution stated in its appellate brief, while arguing trial counsel's effectiveness, that trial counsel "requested ... instructions on the appropriate *defenses.*" (Emphasis added.) This statement in the prosecution's brief, Lebron argues, alerted the Appellate Division to the issue of whether there was an appropriate defense on which trial counsel did not request instructions even though the Appellate Division did not explicitly address the issue, and (2) even if, arguendo, the robbery defense were deemed not presented on direct appeal, this court may still address it since Lebron claims he was "actually innocent" under the robbery defense.

■■■ Lebron's first argument as to why this new claim may be heard is not persuasive. A one-line, passing statement concerning jury instructions in the prosecutor's brief is not enough to advise the appellate court about the issue of the robbery justification defense and whether its omission constituted ineffective assistance of counsel. As the Second Circuit states in *Petrucelli v. Coombe,* 735 F.2d 684, 689 (2d Cir.1984), "Federal judges will not presume that state judges are clairvoyant."

In *Castillo v. Sullivan,* 721 F.Supp. 592 (S.D.N.Y.1989), a habeas petitioner alleged ineffective assistance of trial counsel for failure to raise an intoxication defense at trial. The petitioner described four factual bases for his claim, but only two of them were presented to the appellate court. The court held that the petitioner had not exhausted his state remedies with regard to those unpresented claims. Similarly, in the present case, Lebron presented several factual bases for his ineffective assistance of counsel claim to the Appellate Division. He did not, however, clearly present his claim based on trial counsel's failure to present the robbery justification defense. Since this additional claim is arguably now procedurally barred, a federal court arguably cannot now entertain it. Were there substantive merit to the claim in the sense that this "failure" on the part of trial counsel might have affected the result, exhaustion could be construed from the facts. No inadequacies of counsel, however, had any effect on conviction.

■■■ Lebron's second claim is that this case is one of "actual innocence" and therefore is not procedurally barred. Unfortunately, the record does not indicate that Lebron is actually innocent of "the crime" of which he was found guilty.

The evidence introduced at trial—Arvello's testimony, Lebron's confession to Officer

Graham, and Lebron's presence in the apartment at the time of the shooting—clearly established that Lebron shot and killed Lopez. The outcome of the trial would not have been different had trial counsel raised a robbery justification defense.

Lebron correctly notes that New York's robbery justification defense differs from a regular claim of self-defense in that to succeed on a robbery justification defense, the evidence only has to show that Lopez was threatening Lebron with the immediate use of physical force, and not deadly physical force. Lebron argues that if the jury had been presented with an account describing this case as one involving a robbery justification defense along with a corresponding charge, it would have found that Lebron's actions were justified on that basis. It would have been possible for Lebron's trial counsel to suggest that Lopez was attempting to rob Lebron and it would not have been necessary for trial counsel to argue that the deceased had actually shown a weapon. The evidence at trial was that Lopez came to Arvello's apartment in order to collect a debt from Lebron, that Lebron resisted paying, and that an argument ensued that arguably resulted in Lopez making threats of force to extort payment—a robbery. That Lopez was sufficiently emboldened to make such threats was clear from the armament he had concealed on his person.

In this particular case, it is hard to see how the distinction between these two related defenses could have made a difference to a jury. To the extent that the evidence suggested that Lopez was threatening Lebron at all, the threat was of *deadly* physical force. Defense counsel based the self-defense claim on Lopez' possession of a hunting knife and a sawed-off shotgun and on Arvello's testimony about the argument between Lopez and Lebron in which Lopez allegedly said that "he didn't care to kill or to die", "Remember you have a wife and daughter", and that "he had shot a man with a shotgun before."

In these circumstances, the differences in law did not effectively change the scenario the jury needed to develop in order to either convict or acquit. Contrary to Lebron's suggestion, there is no reason to believe that a robbery justification defense would have been more successful than the regular self-defense claim that was offered.

## IV. CONCLUSION

Lebron's petition for a writ of habeas corpus must be and is denied. His original ineffective assistance of counsel claim does not pass muster under the *Strickland* test. In addition, his expanded argument that trial counsel was ineffective for failure to develop the robbery justification defense or that petitioner was in fact innocent are unpersuasive.

The question is a close one warranting appellate review. A certificate of probable cause is granted.

**SO ORDERED.**