## GOVERNMENT OF THE VIRGIN ISLANDS, Plaintiff
### v.
## TROY HARRIGAN, Defendant

Criminal No. F16/1995

Territorial Court of the Virgin Islands

Div. of St. Thomas and St. John

July 21,1995

ROBERTA KOHN-KREGLO, ESQ., Assistant Attorney General, (Department of Justice), St. Thomas, U.S.V.I., *for plaintiff*

ANDREW L. CAPDEVILLE, ESQ., St. Thomas, U.S.V.I., *for defendant*

HOLLAR, *Judge*

### MEMORANDUM OPINION

## I. INTRODUCTION

This matter is before this Court on a motion filed on behalf of the defendant Troy Harrigan, (a/k/a "Jah Tax"), to suppress certain

inculpatory statements or admissions made by him and to suppress certain tangible evidence seized from his grandmother's home, without a warrant.[1] The Government, however, opposes any exclusion of evidence, claiming that the statement(s) and tangible evidence were lawfully obtained.

At an evidentiary hearing on the suppression motion scheduled March 30, 1995, the Court heard the sworn testimony of officers John A. Meyers, Jr., Corporal Paulette Bell, Captain Vincent Georges, all of the Virgin Islands Police Department, and defendant Troy Harrigan. Also considered were the exhibits and documents duly entered into evidence as well as the memoranda submitted by counsel for the parties and the court record.

For reasons which follow, the defendant's motion to suppress will be denied.

## II. FACTS

On or about January 3, 1995, two (2) masked men opened fire at Dwight Mulley in the vicinity of Paul M. Pearson Gardens. As a result of the attack, Dwight Mulley suffered at least one gun shot wound which necessitated his immediate admission into the ICU Unit at St. Thomas Hospital.

The victim, although wounded, was able to identify both of his assailants to the police. Following the identification, the defendant Troy Harrigan was apprehended and taken into custody at approximately 12:30 p.m., on January 4, 1995, before boarding a flight to St. Croix.[2]

From Cyril E. King Airport, the defendant was transported to the Investigation Bureau located at Nisky Center. During the short ride to the Investigation Bureau, the officers advised the defendant what he was being charged with. Although not being interrogated,

---

[1] The tangible evidence seized included (1) Black Lorcin .380 Serial No. 350961 (loaded); (1) .25 Automatic Sterling (loaded); (10) .25 rounds of ammunition; (15) 9mm rounds of ammunition; and a quantity of marijuana.

[2] At the Suppression Hearing, the defendant emphasized that his trip to St. Croix was to visit his girlfriend, son and mother and to partake in the Three-King's Day Festivities and not to avoid any investigation or prosecution. In support of his contention, the defendant introduced his airplane ticket reflecting a scheduled return to St. Thomas on January 6, 1995.

the defendant volunteered that a "Yankee" was involved in the shooting.

Once at the Bureau, the defendant was officially arrested for first degree assault and advised of his rights on a prepared *"Miranda"* form. Having read the form, the defendant immediately declined to waive his *"Miranda"* rights.

After being advised in greater detail as to why he was being arrested, the defendant requested permission to make a telephone call.[3] Not only was defendant granted permission to make one telephone call, he freely made no less than two (2) telephone calls from the Nisky Investigation Bureau *before* he was transported to Zone "A" for booking.[4]

At approximately 3:30 p.m.,[5] at the conclusion of the booking procedure, the defendant voluntarily spoke to Officer Charleswell, who was at Zone "A" but was not an officer assigned to the case.[6] After speaking with Officer Charleswell, the defendant offered to turn over a weapon to the authorities. Officers Meyers, Bell and Charleswell thereafter escorted the defendant to his grandmother's house in Tutu.

Upon arrival at his grandmother's home, the defendant, while handcuffed, directed the officers to a room he usually occupied. While in the room, the defendant pointed out where the weapon was located. One (1) weapon was retrieved from a location indicated by defendant. A further search was conducted in adjacent areas, where, among other things, a second gun was retrieved.

Following the seizure of the weapons and other contraband, the defendant was driven back to the Bureau of Investigations at Nisky Center, where a consent to search form was prepared by one of the officers.

---

[3] The Bureau of Investigation *was not* a hostile environment for the defendant. In fact, the defendant admitted that he personally knew arresting officer John A. Meyers for several years.

[4] The defendant insists that he told the officer(s) numerous times that he wanted to speak to his attorney, Andrew L. Capdeville, whose office was located in the same building as the Bureau.

[5] It was undenied that the officers had to wait a long time to finish the booking procedure because there was a shortage of forensic officers or forensics was delayed in arriving at Zone "A".

[6] The defendant knew Officer Charleswell personally.

135

Evidently, concerned about being requested to sign a consent form *"after the fact,"* the defendant asked Capt. Vincent Georges, Chief of Investigations, whether he *had* to sign the consent form. In response to the defendant's inquiry, Captain Georges did not hesitate to inform defendant Troy Harrigan emphatically that he *did not* have to sign anything and that *no one would force him or threaten him to do anything.*[7]

After consulting with the Chief of Investigations, the defendant signed a form consenting to the search that was previously conducted at his grandmother's home.[8]

## III. DISCUSSION

In ruling on the defendant's motion to suppress, the Court is called on to determine (1) whether the defendant Troy Harrigan invoked his Fifth Amendment *right to counsel;* (2) whether the defendant Troy Harrigan invoked his Fifth Amendment *"rights to remain silent"*, and if so, whether he subsequently made a voluntary and knowing waiver of that right; and (3) whether the warrantless search of the home of defendant Troy Harrigan's grandmother requires the Court to exclude any tangible evidence seized as a result of a violation of the defendant's Fourth Amendment Rights, and/or by virtue of the "fruit of the poisonous tree" doctrine.

### A. INVOCATION OF RIGHT TO COUNSEL

Assuming *arguendo* that the defendant Harrigan made requests for counsel, as he so contends, only the defendant's Fifth and Fourteenth Amendment rights, as made applicable to residents and constituents of the Territory of the U.S. Virgin Islands, through Section 3 of the Revised Organic Act of 1954, as amended,[9] would have been affected and not the defendant's Sixth Amendment rights, as suggested by counsel for the defendant.

---

[7] The defendant took the stand at the suppression hearing and never denied this colloquy.

[8] Even if the defendant signed the form *before* speaking with the Bureau Chief, it is clear that after consulting with Captain Georges, defendant could have withdrawn his consent, if he chose to do so.

[9] U.S. CODE ANN. tit. 48 § 1561.

■ The U.S. Supreme Court has ruled on several occasions that the *Sixth Amendment right to counsel arises whenever an accused has been indicted or an adversarial criminal proceeding has otherwise commenced* and admissions are subsequently elicited from the accused in the absence of counsel. *Messiah v. United States*, 377 U.S. 201, 84 S. Ct. 1199, 12 L. Ed. 2d 246 (1964); *Mc Neil v. Wisconsin*, 501 U.S. 171, 111 S. Ct. 2204, 115 L. Ed. 2d 1581 (1991). Because no adversarial proceeding had begun at the time the defendant purportedly invoked his right to counsel, only the defendant's Fifth and Fourteenth Amendment rights were implicated.

■ With respect to the *Miranda-Fifth Amendment* right to counsel, if defendant Harrigan had *expressed a desire to deal with the police only through counsel*, no further interrogation could have been entertained until counsel was made available to the defendant, unless the defendant initiated further communication, exchanges, or conversations with the police. *Edwards v. Arizona*, 451, U.S. 477, 101 S. Ct. 1880, 68 L. Ed. 2d 378 (1981).

■ *Miranda*[10] itself indicates that the assertion of the right to counsel is a significant event and that once exercised by the accused, "the interrogation must cease until an attorney is present." 384 U.S. at 474, 86 S. Ct. at 1627. See also, *Fare v. Michael C.*, 442 U.S. 705, 719, 99 S. Ct. 2560, 2569 (1979); *Rhode Island v. Innis*, 446 U.S. 291, 298, 100 S. Ct. 1682, 1688, 64 L. Ed. 2d 297 (1980).

In the case under consideration, the defendant contends that he not only repeatedly requested counsel "in general", but particularly requested Attorney Andrew L. Capdeville, whose law offices were in the same building as the Bureau of Investigations.[11] According to defendant, he requested his attorney at least 10 times "during interrogation" at the Nisky Investigation Bureau, but the police ignored all of his requests and advised the defendant that he would be permitted to contact his attorney only if he surrendered the weapon involved in the assault that occurred the previous day.

---

[10] *Miranda v. Arizona*, 384 U.S. 486, 86 S. Ct. 1602, 16 L. Ed. 2d 694 (1966).

[11] It was testified by defendant that Attorney Capdeville represented him before. Also Attorney Capdeville was subsequently *retained* by defendant in this matter and was not *appointed*.

The defendant also stated that the police told him that he did not need a lawyer and that it would only cost him money.[12]

The police officers completely deny that the defendant ever made a request for counsel. Furthermore, the officers indicated that if the defendant had made any such request, he would have been freely permitted to contact his attorney, in the same manner as he was allowed to make telephone calls to his girlfriend and an associate.

In reconciling the divergent positions of the parties regarding the defendant's assertion that he made a specific request for counsel, the Court can not give credence to the defendant's contentions for several reasons.

First, minutes after being transported from Cyril E. King Airport, defendant signed a Miranda Warning of Rights form, reflecting that he was read his rights and that he understood what his rights were. The fourth sentence of the "Warning Of Rights" stated: *"You have the right to talk to a lawyer for advice before we question you and to have him with you during questioning."* The fifth sentence stated: *"If you cannot afford a lawyer and want one, a lawyer will be appointed for you by the court free of charge and no cost to you.* Obviously understanding those rights, the defendant lost no time in declining to waive his rights.[13] Having been read his *unequivocal right* to obtain advice from counsel *before being questioned,* having been advised of his *unequivocal right* to have his counsel present during questioning, and having been advised that if he could not afford counsel, one would be appointed for him, this Court does not find that the defendant was tricked or deceived into abandoning any of those asserted rights.[14]

Secondly, at the hearing, it was uncontroverted that the defendant requested to make a telephone call. In response to that single request, he was freely permitted to make at least two (2) telephone

---

[12] See Defendant's Affidavit, dated February 28, 1995, filed in support of his motion to suppress.

[13] Exactly one minute after reading his rights, defendant refused to waive his rights.

[14] The Court is satisfied from the testimony that defendant is a businessman, who from his demeanor appeared to be intelligent, sophisticated and unlikely to be "hoodwinked" by the police. Furthermore, it was represented by the Government that defendant had at least three (3) prior contacts with the criminal justice system.

calls. If the defendant made as many desperate requests for a counsel, as he maintains he did, logic dictates that he would have utilized at least one of his telephone calls to contact his attorney.

Thirdly, assuming *arguendo* that the defendant was "unable" to contact his attorney directly, given the liberal telephone privileges extended to the defendant along with the friendly atmosphere that existed between defendant and the investigating officers, the defendant had ample opportunity to ask the individuals he called to immediately contact his attorney. Such options were not exercised, and the Court finds there existed no "impediment" to prevent the defendant from exercising such options.

Taking all the facts into consideration, the Court concludes that the defendant Troy Harrigan did invoke his *Miranda-Fifth Amendment* right *to remain silent*, but *did not specifically request counsel* as any prerequisite to any further interrogation.

## B. SUBSEQUENT WAIVER OF RIGHTS

It is undisputed that the defendant Troy Harrigan invoked his right to remain silent shortly after being taken into custody. It is also acknowledged that the defendant made certain statements to police officers that led to a search of his grandmother's home where tangible evidence was retrieved, ostensibly linking defendant to the crime he was charged with.

The defendant argues that once he exercised his right to remain silent, the police could not again question him, absent an additional reading of *Miranda*, accompanied by a valid waiver.

The police officers insist that the defendant was not interrogated after he declined to waive his *Miranda* rights. Instead, the officers maintain that the defendant continued to make spontaneous and unsolicited statements to certain member(s) of the police force.

As was done in *Michigan v. Mosley*, 423 U.S. 96, 96 S. Ct. 321, 46 L. Ed. 2d 313 (1975), resolution of the issue regarding *waiver of right to remain silent* turns on the interpretation of a single passage in *Miranda* that states:

> "Once warnings have been given, the subsequent procedure is clear. If the individual indicates in any manner, at any time prior to or during questioning, that he wishes to remain silent,

the *interrogation must cease*. At this point he has shown that he intends to exercise his Fifth Amendment privilege; any statement taken after the person invokes his privilege cannot be other than the product of compulsion, subtle or otherwise. Without the right to cut off questioning, the setting of in-custody interrogation operates on the individual to overcome free choice in producing a statement, after the privilege has been once invoked." 384 U.S., at 473-474, 86 S. Ct., at 1627.

In interpreting the phrase "the interrogation must cease", when the person in custody indicates that "he wishes to remain silent", the Court in Mosley, *supra,* noted that the passage does not state under what circumstances, if any, a resumption of questioning would be permissible.

In reviewing three (3) literal interpretations of the passage, the *Mosley* Court said:

"The passage could be literally read to mean that a person who has invoked his "right to silence" can never again be subjected to custodial interrogation by any police officer, at any time or place on any subject. Another possible construction of the passage would characterize "any statement taken after the person invokes his privilege" as "the product of compulsion" and would therefore mandate its exclusion from evidence, even if it were volunteered by the person in custody without any further interrogation whatever. Or the passage could be interpreted to require only the immediate cessation of questioning, and to permit a resumption of interrogation after a momentary respite."

Rejecting the three (3) interpretations, the Court held that any of the literal constructions of the passage would lead to absurd and unintended results.

■ The Court, instead, concluded that an appropriate interpretation of the passage was one where the admissibility of statements obtained after the person in custody decided to remain silent depended on whether the *"right to cut off questioning"* was *"scrupulously honored"*.

Applying the standard adopted in *Mosley* to the facts in the case sub judice, the Court concludes that the defendant's statements

140

were "spontaneous" and "unsolicited" statements initiated by him and offered to voluntarily show the officers where the weapon was that was involved in the shooting.[15] *See Kuhlmann v. Wilson,* 477 U.S. 436 (1986). The Court further concludes that the offer was made at Zone "A" to Officer Charleswell, during the time when the "booking" procedure was ending. If the statements were made at the Nisky Bureau before the defendant was transported to Zone "A", as defendant implies, the officers would have taken defendant directly from Nisky to Estate Tutu.[16]

Because the defendant's statements regarding the location of a firearm were not made as a result of any interrogation by the police officers but as voluntary statements made to Officer Charleswell at the conclusion of the booking procedure, the Court finds that the defendant's right to cut off questioning remained scrupulously honored by the police officers. Accordingly, the incriminating statements of the defendant and any "fruits" of those statements will not be suppressed.

## C. CONSENT TO SEARCH

After being arrested and booked, the defendant Troy Harrigan, handcuffed, accompanied three (3) police officers to this grand-mother's home located in Estate Tutu, after expressing a desire to the officer(s) to turn over a weapon.

Once the defendant and police officers arrived at the home of the defendant's grandmother, the defendant directed the officers to a room which he occupied. In the room, the police officers were directed by the defendant to a location where a weapon was retrieved. In and around the same area where the first weapon was located, the police retrieved a second weapon, ammunition and some marijuana.

The defendant now argues that all of the tangible evidence seized from his grandmother's home should be suppressed since

---

[15] From the time the officers informed the defendant that he was being taken into custody for the shooting of Dwight Mulley, the defendant insisted that a "Yankee" had done the shooting. Perhaps, in an effort to convince the police that his participation in the shooting was limited to "holding the weapon" for the perpetrator, the defendant volunteered to produce the weapon.

[16] Clearly, the officers would not have waited around for approximately two (2) hours for forensics to come to book the defendant before pursuing such a vital piece of evidence.

the search was without a warrant and in violation of the "fruits of the poisonous tree" doctrine.

The Fourth Amendment to the United States Constitution provides:

> "The right of the people to be secure in their persons, houses, papers, and effects, against *unreasonable searches and seizures,* shall not be violated, and no warrants should issue, but upon probable cause, supported by oath or affirmation and particularly describing the place to be searched, and the persons or things to be seized".

■ Although it is well settled that a search conducted without the issuance of a warrant executed upon probable cause is per se unreasonable, an exception to the requirements of both a warrant and probable cause is a search that is conducted pursuant to consent.

The Government, through the police officers, maintains that the search of the defendant's grandmother's house was a result of a voluntary consent given by the defendant, even though he was arrested. See *United States v. Watson,* 423 U.S. 411, 96 S. Ct. 820, 46 L. Ed. 2d 598 (1976). The consent given by the defendant was further reduced to writing and signed by the him.

While it is undenied that a *written* consent was given by the defendant to search his grandmother's home, the issue before this court is whether the consent was *freely and voluntarily* given *without any coercion.*

In order to resolve whether the consent was voluntarily given without coercion, the court must considered the "totality of the circumstances". Based upon the testimony, (1) the defendant was personally acquainted with at least two police officers involved in the search; (2) the defendant directed the police to his grandmother's home, a location where the police would not be likely to interrogate the defendant about, since all information received by the Police Department referred to defendant's residence as Estate Tutu 173-301 and *not Estate Tutu 148-210,* his grandmother's home; (3) once the defendant arrived at his grandmother's home with the police, it was the defendant who led the officers to a room he occupied; (4) the defendant directed the officers to the area in his

room where the weapon was located; and (5) after seizing the weapon, ammunition and marijuana, the defendant was taken back to the Nisky Investigation Bureau where he signed a form attesting to his consent of the search.[17]

Either *before* or *immediately after* signing the consent form, the defendant asked Vincent Georges, the Chief of Investigations, if *he had to sign the form* and the Chief emphatically advised the defendant that *he did not have to sign anything*, and further *no one would force him or threaten him to do anything*.

Based upon the circumstances of the search, together with the consent form signed by the defendant after being advised and assured by the top investigating officer that *he did not have to sign the form and no one would require him to do so*, this Court is convinced that the defendant Troy Harrigan freely and voluntarily consented to the police's search of the home of his grandmother on January 4, 1995, immediately after he was booked at Zone "A" Command.

## IV. CONCLUSION

Based on the foregoing, the Court concludes that: (1) the defendant never expressed a desire to deal with police only through counsel, although invoking his Miranda-Fifth Amendment right to remain silent; (2) subsequent to invoking his Miranda-Fifth Amendment Right to remain silent, defendant waived that right by making spontaneous and unsolicited voluntary statements to police officers; and (3) the defendant voluntarily gave consent to the police to search the home of his grandmother, located at Estate Tutu 148-210, and that consent was reduced to writing signed by the defendant.

Accordingly, the motion to suppress certain inculpatory statements and admissions made by defendant and to suppress certain tangible evidence seized from the home of the defendant's grandmother without a warrant will be DENIED.

---

[17]The Court also took into consideration that the defendant's statements and consent to search were made *after a lawful arrest, after his booking and just before he was taken to the Bureau of Corrections.*