Filed 7/11/14  P. v. Gates CA4/3

**NOT TO BE PUBLISHED IN OFFICIAL REPORTS**

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FOURTH APPELLATE DISTRICT

DIVISION THREE

| | |
|---|---|
| THE PEOPLE,<br><br>  Plaintiff and Respondent,<br><br>  v.<br><br>CHRISTIAN DANIEL GATES,<br><br>  Defendant and Appellant. | G049834<br><br>(Super. Ct. No. RIF154674)<br><br>O P I N I O N |

Appeal from a judgment of the Superior Court of Riverside County, Mark E. Johnson, Jeffrey Prevost, Ronald Taylor, and Charles J. Koosed, Judges.  Affirmed as modified, reversed in part, and remanded for a new sentencing hearing.

Stephen M. Lathrop, under appointment by the Court of Appeal, for Defendant and Appellant.

Kamala D. Harris, Attorney General, Dane R. Gillette, Chief Assistant Attorney General, Julie L. Garland, Assistant Attorney General, A. Natasha Cortina and Christine Levingston Bergman, Deputy Attorneys General, for Plaintiff and Respondent.

A jury convicted Christian Daniel Gates of two counts of first degree burglary (Pen. Code, §§ 459, 460, subd. (a); all further references are to the Penal Code (counts 1 & 5)), carrying a loaded firearm (§ 12031, subd. (a)(2)(B); count 2), attempted murder (§§ 187, 664; count 3), and attempted robbery (§§ 211, 664; count 4), and the jury found true allegations Gates personally and intentionally discharged a firearm during the commission of counts 3 and 4 (§§ 1192.7, 12022.53, subd. (c)), and that he committed counts 1, 3, 4, and 5 for the benefit of a criminal street gang (§ 186.22, subd. (b)).

The trial court sentenced Gates to 15 years to life on count 3, plus a consecutive 20 years for personal use of a firearm. The court also imposed a consecutive aggregate 11-year term on count 1, a concurrent two-year term on count 2, a concurrent aggregate term of 27 years on count 4, and a consecutive aggregate term of three years on count 5.

Gates raises five challenges to the judgment. First, he argues the trial court abused its discretion by denying his *Pitchess* motions,[1] and by admitting statements he made to a deputy sheriff during his pretrial incarceration in the Riverside County jail. Second, he challenges the sufficiency of the evidence to support the conviction on count 1, and the gang enhancement finding attached to count 1. Finally, Gates claims the verdict form did not expressly state the jury found the attempted murder (count 3) to also be a *premeditated* attempted murder, a difference that would significantly impact the trial court's imposition of sentence.

We agree with Gates final contention, modify the judgment and remand for a new sentencing hearing. In all other respects, the judgment is affirmed

**FACTS**

On December 6, 2009, Riverside County Sheriff Deputy Joshua Little stopped a car that was driven by Lafayette Jones, a member of the Sex Cash Money

---

[1] *Pitchess v. Superior Court* (1974) 11 Cal.3d 531.

(SCM) criminal street gang. Gates, Harold Ransom, and Jeffrey Davis, Jr., were passengers in the car. Gates told Little he was an affiliate of the SCM gang. He produced his school identification card from a red child's backpack.

On December 7, Kenya Guiterrez left her home on Lateen Drive in Moreno Valley at approximately 7:50 a.m. Later that afternoon, Guiterrez realized her home had been burglarized, and that several items of personal property had been taken, including a .40-caliber Smith & Wesson handgun.

Around 1:00 p.m. that afternoon, Gates and Daryl Knighten went to a recycling center in Moreno Valley. Gates was carrying a red child's backpack. Knighten and Gates approached Krongsak Worasing, a worker at the recycling center, with a bag of recyclables. Worasing sorted through the items and told Gates and Knighten he could give them $1.61 for the lot. Worasing noted the amount in his ledger, and Gates signed the ledger, but he used the false name, James Baily.

Gates then reached inside the backpack and retrieved a .40-caliber handgun. He pointed the gun at Worasing's chest and demanded Worasing turn over all his money. Worasing refused, saying, "I work too hard for my money." Gates, gun still aimed at Worasing, pulled the trigger. However, the gun misfired and Worasing was uninjured. Gates then cleared the jammed round and pulled the trigger, again. This time the gun fired, but Gates's missed Worasing.

After the second shot, Gates and Knighten fled the scene. Worasing identified Knighten from a photo lineup as the person accompanying the shooter. Worasing identified Gates at trial and said he was the person with the backpack who had demanded his money and shot at him. He did not identify Gates from a photographic lineup.

Around four hours after the shooting, Elsie Moore, who lived about a block away from the recycling center, found a red children's backpack inside one of her garbage cans. Guiterrez's .40-caliber handgun and Gates's student identification card

3

were found inside the backpack. Forensic evidence later linked shell casings found at the recycling center to Gutierrez's stolen gun.

Two days later, December 9, Robert Jones saw Gates, Knighten, and another SCM member, Anthony Harris, break into a home located on Blackhawk Lane in Moreno Valley.

At trial, Jones testified that his attention had been drawn to a gold, four-door car that he saw driving slowly through his neighborhood. The car finally came to a stop in front of a residence on Blackhawk Lane. Then, Jones noticed a man in a white T-shirt, "white hooded thing," a cap, and black pants or shorts, get out of the car and go into the backyard of the residence. He quickly returned to the car, but then he and two other men from the car, one wearing a black shirt, black pants, and blue shoes, went into the backyard of the home. Jones, who had called 911 by this time, told the 911 dispatcher the three men were most "probably breaking in." After a few minutes, Jones told the 911 operator he saw the three men reemerge from the backyard and return to their car. He noticed that one of the men was carrying something under his shirt. After the three men got back into the gold car, the car left the neighborhood.

A Riverside County Sheriff's deputy stopped a gold Lexus just a couple of blocks away from the Blackhawk residence. Gates and Harris ran from the stopped car while Knighten, the driver, was detained at the scene. A police officer chased Gates through a parking lot. The officer found a pair of black pants, a gray sweater or sweatshirt, a black baseball cap, black cloth gloves, and a green BIC lighter that had been discarded along Gates's flight route. Gates was later found hiding behind a bush near the 60 freeway.

A search of the car turned up a .177-caliber pellet gun, which was the size of an empty pellet gun box found inside the Blackhawk residence, a green bandana, and a cap with the letter "C" on the front.

4

Meanwhile, another police officer who had responded to the burglary call was stopped by a bystander in the area. The bystander said that one of the three suspects had run into a nearby market. The officer found Harris inside the store. Harris was wearing black pants and a black T-shirt. He had also discarded one of his blue and white Nike tennis shoes while inside the store.

Riverside County Sheriff Deputy Brady Zimolzak drove Jones to in-field show ups at the three locations where the suspects had been detained. Jones identified the car as the one parked at the scene of the burglary, and he identified Gates, Harris, and Knighten as the three men involved in the burglary.

*Gang Expert Testimony*

Riverside County Sheriff Deputy Mario Moreno testified as the prosecution's gang expert. Moreno said SCM is a predominately African-American criminal street gang in Moreno Valley. The gang's favorite color is green, and its members often wear green bandanas. The gang's common signs or symbols include the letters "SCMG," or "S," and the dollar sign ($). Gang members also wear baseball caps with a "W" for Webster Avenue, a "C" for cash, or an "S" for sex cash.

In 2009, SCM had approximately 150 to 170 members, and its primary activity is the commission of robberies and residential burglaries. Moreno testified about several other crimes committed by SCM members, including residential burglaries, a carjacking, a murder, and possession of marijuana for sale. Moreno stated that the SCM gang made money by committing residential burglaries and selling stolen goods, and that the gang uses the money generated by this activity to purchase firearms.

Moreno also testified that Gates, Harris, Knighten, Jamall Adams, Damon Ridgeway, Deonte Page, and Lafayette Jones were active members of the gang. Gates's gang nickname was "Sonic," and he has the word "Sonic" tattooed on one of his arms. Moreno also testified the green bandana and cap with the letter "C" on the front that was

found in the gold Lexus were indicative of the SCM gang.  Furthermore, according to Moreno, Knighten lived close to Guiterrez's house on Lateen Drive.

When the prosecutor posed a hypothetical question based on the facts of the Lateen Drive burglary, Moreno testified that residential burglary benefitted SCM by providing revenue for gun purchases, and that the guns would be used in future crimes and to protect the gang from rival gang members.  In addition, Moreno testified the crime was committed in association with a criminal street gang because it was committed by two SCM gang members.  Based on additional hypothetical questions, Moreno opined the robbery and attempted murder at the recycling center benefitted the gang, and that Gates committed both crimes in association with two other SCM gang members.

## DISCUSSION

*1. Pitchess Motion*

Through several pretrial *Pitchess* motions, Gates sought the discovery of any citizen complaints, complaints of misconduct, internal investigations, previous discipline, or any evidence of dishonesty, false arrest, fabrication of charges or evidence, falsifying reports, or perjury for Moreno Valley Police Officers Jonathon Thompson, J. Bodnar, and Jose Vasquez, and Riverside County Sheriff Deputies Mailloux, Notz, Jeremy Livingston, and Joshua Little.[2]  The trial court found good cause to conduct an in camera review of the personnel files for Thompson, Bodnar and Vasquez, Notz and Little.

The sealed transcripts from the in camera hearings remain sealed. However, the trial court announced its rulings in open court.  As to Thompson, the trial court stated that it found "an allegation of dishonesty from June 14th, 2009, that was suspected that was not sustained.  So on that . . . I am ordering the names, addresses, and telephone numbers of the witnesses, the police reports, as well as the investigation

---

[2]  We intend no disrespect in referring to some of the officers by the partial names provided in the record.

6

results."  The trial court also ordered the release of names, addresses, and telephone numbers, police reports, and investigation results from an incident at the Riverside County Regional Medical Center involving Thompson in January 2010.

As to Little, the trial court determined there was one discoverable incident, a citizen complaint that had been investigated, but determined to be unfounded, and ordered the release of information related to that incident.  The trial court found nothing to disclose as to Bodnar, Vasquez, and Notz.

Gates requests appellate review of the trial court's rulings on his various *Pitchess* motions, and the documents produced in response to those motions, to ensure the lower court's compliance with the procedural guidelines set out in *People v. Mooc* (2001) 26 Cal.4th 1216, 1228-1230 (*Mooc*), and the Attorney General does not object. When challenged on appeal, the trial court's decision regarding the discoverability of material in police personnel files is reviewed under the abuse of discretion standard. (*People v. Cruz* (2008) 44 Cal.4th 636, 670.)

Although the actual documents screened by the trial court were not made part of the record on appeal, "the sealed transcript that is before us . . . is adequate for purposes of conducting a meaningful appellate review. [Citation.]"  (*People v. Myles* (2012) 53 Cal.4th 1181, 1209.)  The custodian of records was sworn before the court and testified that all records responsive to the defense motion were available for the court's review.  (*Mooc*, *supra*, 26 Cal.4th at pp. 1228-1230; *People v. White* (2011) 191 Cal.App.4th 1333, 1340.)  The court, not the custodian of records, described each document for the record, conducted a thorough review of the individual documents, and then determined the relevancy of these documents to Gates's *Pitchess* motions.  (*Mooc*, at pp. 1229-1230.)  In the absence of any indication to the contrary, we find no error or justification for remanding the matter for further proceedings.  (See *People v. Wycoff* (2008) 164 Cal.App.4th 410, 414-415.)

7

*2. Admission of Gates's Statements to Livingston*

Gates moved pretrial to exclude statements he made to a deputy sheriff during his pretrial incarceration.[3] At the Evidence Code section 402 hearing on the admissibility of these statements, Riverside County Sheriff Deputy Jeremy Livingston, a supervisor of one of the Riverside County jail's living units, or pods, testified that he has frequent contact with inmates through the jail's intercom system. Inmates pick up a phone, and he responds from a central supervision area. He testified that the inmates will discuss a wide variety of topics during these routine conversations.

On April 11, 2010, Gates used the jail intercom to ask Livingston about his charges. Gates and Livingston were engaged in a "casual conversation" when Livingston said, "'Let me guess. All the guilty ones are—all the innocent ones are here and the guilty ones are still on the street.'" Gates responded, "'No. I'm guilty. I just want to know my charges.'" Livingston told Gates the charges against him, and then Livingston shut off the intercom.

Gates contends that Livingston's remark, "'Let me guess. Everybody in here is innocent and all the guilty ones are in the streets,'" "[w]hen viewed through the correct legal prism . . . can only be characterized as deliberate elicitation within the meaning of Sixth Amendment jurisprudence." In other words, he contends Livingston's seemingly off-hand comment was instead a "knowing[] and purposeful[]" attempt to interrogate Gates after the right to counsel had attached.

---

[3] Defense counsel claimed his client's statement was obtained in violation of *Miranda v. Arizona* (1966) 384 U.S. 436, Evidence Code section 352, and "federal due process rights." The Attorney General asserts Gates forfeited his right to challenge the admission of his statements on Sixth Amendment grounds by failing to object on that ground at trial. Gates acknowledges the defect, but insists any failure to object on Sixth Amendment grounds constitutes ineffective assistance of counsel. We need not linger over the forfeiture argument because we find no error in the trial court's evidentiary ruling.

8

"The Sixth Amendment to the federal Constitution provides in pertinent part: 'In all criminal prosecutions, the accused shall enjoy the right . . . to have the Assistance of Counsel for his defence.' This right 'attaches' "'at or after the initiation of adversary judicial criminal proceedings—whether by way of formal charge, preliminary hearing, indictment, information, or arraignment.'" [Citation.] After it both attaches and is invoked, any incriminating statement the government deliberately elicits from a defendant in counsel's absence is inadmissible at that defendant's trial. [Citations.]' [Citation.]" "'"The question here is whether under the facts of this case a Government agent 'deliberately elicited' incriminating statements . . . within the meaning of *Massiah* [*Massiah v. United States* (1964) 377 U.S. 201]" . . . .' [Citation.] 'This inquiry is objective and does not focus on the subjective intentions of the state officer.' [Citation.]" (*People v. Huggins* (2006) 38 Cal.4th 175, 244-245 (*Huggins*).)

Gates primarily relies on *Kuhlman v. Wilson* (1986) 477 U.S. 436, 459 (*Kuhlman*) and *Brewer v. Williams* (1977) 430 U.S. 387 (*Brewer*), but his reliance is misplaced.

In *Kuhlman,* a police officer instructed an informant to listen to the defendant to ascertain the identities of others involved in a robbery and murder. Law enforcement had other solid evidence of the defendant's participation. The informant followed the instructions, asked no questions of the defendant about the pending charges, and only listened to the defendant's spontaneous and unsolicited statements. (*Kuhlman*, *supra*, 477 U.S. at pp. 439-440.) Under this set of facts, the Supreme Court found no Sixth Amendment violation. (*Id.* at p. 436.)

The *Kuhlman* court noted "the primary concern of the *Massiah* line of decisions is secret interrogation by investigatory techniques that are the equivalent of direct police interrogation. . . . [T]he defendant must demonstrate that the police and their informant took some action, beyond merely listening, that was designed deliberately to elicit incriminating remarks." (*Kuhlman*, *supra*, 477 U.S. at 459.) "'[T]he Sixth

9

Amendment is not violated whenever—by luck or happenstance—the State obtains incriminating statements from the accused after the right to counsel has attached.'" (*Ibid.*)

In *Brewer* a 10-year-old girl disappeared. The defendant ultimately surrendered to authorities. When he appeared in court, the defendant conferred with an attorney, and the court advised him of his *Miranda* rights. Because police officers had to transport the defendant by police car from Davenport to Des Moines, Iowa, his attorney advised the transporting detectives that they could not question the defendant during the drive. Nevertheless, during that 160-mile drive, a detective who knew the defendant was a former mental patient and deeply religious, used the drive to goad the defendant into statements tantamount to a confession.

*Brewer* characterized the detective's statements to the defendant as an "interrogation" and held "[t]here can be no serious doubt" that the detective "deliberately and designedly set out to elicit information from [defendant] just as surely as—and perhaps more effectively than—if he had formally interrogated him." (*Brewer*, *supra*, 430 U.S. at p. 399.) *Brewer* held that in giving the "'Christian burial speech,'" (*id.* at p. 400), the detective "purposely sought . . . to obtain as much incriminating information as possible." (*Id.* at p. 399.) *Brewer* held the defendant's response to the detective's statements did not constitute a waiver of his right to counsel, and that the interrogation violated the defendant's Sixth Amendment right to counsel. (*Id.* at pp. 401, 404-406.)

Here, there was no informant. Instead, Gates buzzed the intercom and Livingston answered. Livingston needled defendant about the oft-repeated joke that there are no guilty people in jail. His statement, although sarcastic and slightly provocative, was not calculated to elicit incriminating statements from Gates. Gates made the decision to respond to Livingston with an admission, sarcastic or not. Afterward, Livingston did not ask any more questions, he merely told Gates what charges were pending. In sum, at no point did Livingston "'intentionally create[] a situation likely to induce [the defendant]

10

to make incriminating statements without the assistance of counsel.'  [Citation.]"
(*Huggins*, *supra*, 38 Cal.4th at pp. 244-245.)  We find no error in the trial court's
evidentiary ruling.

*3.  Sufficiency of the Evidence - Burglary*

The prosecution relied, in part, on evidence that Gates possessed a firearm
that had been stolen within a few hours of the burglary on Lateen Drive to prove his
participation in the crime.  Gates claims the evidence established nothing more than his
possession of recently stolen property, which is legally insufficient to support the jury's
verdict on the Lateen Drive burglary charge.  The Attorney General counters that
possession of recently stolen property is so incriminating that to warrant a conviction
there need be only slight corroboration of the crime, and the corroboration here came in
the form of the time, place, and manner of Gates's possession of the recently stolen gun.
We agree with the Attorney General.

"In assessing the sufficiency of the evidence, we review the entire record in
the light most favorable to the judgment to determine whether it discloses evidence that is
reasonable, credible, and of solid value such that a reasonable trier of fact could find the
defendant guilty beyond a reasonable doubt.  [Citations.]  Reversal on this ground is
unwarranted unless it appears 'that upon no hypothesis whatever is there sufficient
substantial evidence to support [the conviction].'  [Citation.]"  (*People v. Bolin* (1998) 18
Cal.4th 297, 331.)

In accordance with established law, the trial court instructed the jury with
CALCRIM No. 376, which told the jury, "If you conclude that the defendant knew he
possessed property and you conclude that the property had, in fact, been recently stolen,
you may not convict the defendant of burglary based on those facts alone; however, if
you also find that supporting evidence tends to prove his guilt, then you may conclude
that the evidence is sufficient to prove he committed burglary.  The supporting evidence
need only be slight and need not be enough by itself to prove guilt.  You may consider

11

how, where, and when the defendant possessed the property along with other relevant circumstances tending to prove his guilty of burglary. You may also consider the opportunity to commit the crime and the attributes of possession; e.g., the time, place, and manner of possession that tends to show guilt. Remember that you may not convict the defendant of any crime unless you are convinced that each fact essential to that conclusion that the defendant is guilty of that crime has been proved beyond a reasonable doubt."

Here, Gates used the gun that had been stolen from Gutierrez's home on Lateen Drive to rob and attempt to kill Worasing. He was tied to both crimes by his distinctive backpack, the school identification card it contained, and the stolen gun, all of which were found together in a garbage can just a few blocks from the recycling center. Moreover, Gates was an active participant of SCM. According to expert testimony, the primary activities of SCM include the commission of robberies and burglaries. Thus, we have an active participant in SCM committing his gang's default crimes. And, although not as persuasive, there was corroboration in the fact that Knighten lived just down the street from Gutierrez's home on Lateen Drive. From these facts, i.e., the how, where, and when of Gates's gun possession and his opportunity to commit the underlying burglary, the jury made a permissible inference that Gates was guilty of the burglary on Lateen Drive. Substantial evidence supports the jury's conclusion.

*4. Sufficiency of the Evidence - Gang Enhancement*

Gates challenges the sufficiency of the evidence to prove the gang enhancement associated with count 1. He argues, "In view of the unwitnessed nature of the burglary on Lateen Drive, appellant's subsequent possession of an item taken during the burglary does not give rise to a credible inference that appellant committed the burglary (1) for the benefit of, at the direction of, or in association with, any criminal street gang, or (2) with the specific intent to promote, further, or assist in any criminal conduct by gang members."

12

"In considering a challenge to the sufficiency of the evidence to support an enhancement, we review the entire record in the light most favorable to the judgment to determine whether it contains substantial evidence—that is, evidence that is reasonable, credible, and of solid value—from which a reasonable trier of fact could find the defendant guilty beyond a reasonable doubt. [Citation.] We presume every fact in support of the judgment the trier of fact could have reasonably deduced from the evidence. [Citation.] If the circumstances reasonably justify the trier of fact's findings, reversal of the judgment is not warranted simply because the circumstances might also reasonably be reconciled with a contrary finding. [Citation.] 'A reviewing court neither reweighs evidence nor reevaluates a witness's credibility.' [Citation.]" (*People v. Albillar* (2010) 51 Cal.4th 47, 59-60 (*Albillar*); *People v. Ochoa* (2009) 179 Cal.App.4th 650, 657.)

To establish a gang enhancement, the prosecution must prove that the crime was (1) "committed for the benefit of, at the direction of, or in association with any criminal street gang," and (2) that the defendant had "the specific intent to promote, further, or assist in any criminal conduct by gang members . . . ." (§ 186.22, subd. (b)(1).) The crime must be "'gang related.'" (*People v. Gardeley* (1996) 14 Cal.4th 605, 622, 625, fn. 12; *People v. Castaneda* (2000) 23 Cal.4th 743, 745.) Gang membership alone does not suffice to establish the gang enhancement. (*People v. Gardeley*, *supra*, at pp. 623-624.) "[T]o prove the elements of the criminal street gang enhancement, the prosecution may . . . present expert testimony on criminal street gangs. [Citation.]" (*People v. Hernandez* (2004) 33 Cal.4th 1040, 1047-1048.)

The gang expert testified residential burglaries are one of SCM's primary activities, and SCM members commit those crimes for the purpose of obtaining property to sell and guns or other weapons. For instance, in this case, the prosecution argued Gates and Knighten committed the Lateen Drive burglary and stole the gun they later used to rob and shoot Worasing. The expert also opined the burglary also provided

13

revenue for the gang, and as in this case, any weapons discovered in a burgled home could be used in future gang-related crimes. Gates claims the prosecution failed to prove he participated in the burglary. But assuming the evidence established that much, he claims it certainly did not prove he "perpetrated the crime for other than purely personal reasons."

Although this is a close case, reversal cannot be justified by the possibility that the evidence might have been reconciled with a finding that he acted only for personal reasons. (See *People v. Albillar*, *supra*, 51 Cal.4th at p. 60.) The prosecution produced evidence tending to prove Gates committed the Lateen Drive burglary in association with Knighten. In other words, two SCM members committed the typical crime for their gang. True, there were no eyewitnesses to the burglary, but Knighten lived just down the street from the burgled home, and he and Gates used a gun stolen from that home to commit the robbery and attempted murder of Worasing mere hours later. Thus, the jury could reasonably infer Knighten and Gates, both SCM members, associated with each other to commit the Lateen Drive burglary with the specific intent to promote, further, or assist each other and their gang. (See *Abillar*, *supra*, 51 Cal.4th at pp. 60-62.) Consequently, the evidence, slim as it is, is sufficient to support the jury's finding that Gates, with the requisite intent, committed the Lateen Drive burglary "at the direction of, for the benefit of, or in association" with the SCM gang.

5. *Verdict Forms, Section 115, and Apprendi*

Count 3 charged Gates with a violation of "section 664/187, subdivision (a), a felony, in that . . . he did willfully, unlawfully, and with malice aforethought attempt the willful, deliberate and premeditated murder of KRONGSAK WORASING, a human being." The jury was instructed on the theory of premeditated, attempted murder. It was also instructed that if it found Gates guilty of attempted murder, then it had to decide whether the prosecution also proved the attempted murder was done with deliberation and premeditation. The verdict form, however, merely stated, "We, the jury

14

in the above-entitled action, find the defendant, CHRISTIAN DANIEL GATES, guilty of the Penal Code, ATTEMPTED MURDER, as charged under count 3 of the information."

On appeal, Gates claims the fact the verdict form did not specifically state the jury found him guilty of attempted, *premeditated* murder, means the jury never made that finding and the trial court improperly sentenced him to a life term under section 664, subdivision (a). The Attorney General agrees there was error, but asserts Garcia forfeited any challenge to the verdict form by failing to object at trial.[4] In addition, the Attorney General argues the error is a mere technical defect that does not affect the verdict or sentence. We find Gates's arguments on this point persuasive.

Section 664, subdivision (a) states, in pertinent part, "If the crime attempted is punishable by imprisonment in the state prison, or by imprisonment pursuant to subdivision (h) of Section 1170, the person guilty of the attempt shall be punished by imprisonment in the state prison or in a county jail, respectively, for one-half the term of imprisonment prescribed upon a conviction of the offense attempted. *However, if the crime attempted is willful, deliberate, and premeditated murder, as defined in Section 189, the person guilty of that attempt shall be punished by imprisonment in the state prison for life with the possibility of parole. . . . The additional term provided in this section for attempted willful, deliberate, and premeditated murder shall not be imposed unless the fact that the attempted murder was willful, deliberate, and premeditated is charged in the accusatory pleading and admitted or found to be true by the trier of fact.*" (Italics added.)

Gates contends that because the verdict form for count three failed to provide a space for the jury to state it found the attempted murder had been committed with premeditation or deliberation, he stands convicted of attempted murder without premeditation and deliberation, relying on section 1157.

_____

4 Assuming forfeiture, we address the merits to forestall the inevitable ineffective assistance of counsel claim.

15

Section 1157 provides: "Whenever a defendant is convicted of a crime or attempt to commit a crime which is distinguished into degrees, the jury . . . must find the degree of the crime or attempted crime of which he is guilty. Upon the failure of the jury . . . to so determine, the degree of the crime or attempted crime of which the defendant is guilty, shall be deemed to be of the lesser degree." "[T]he key is not whether the 'true intent' of the jury can be gleaned from circumstances outside the verdict form itself; instead, application of [section 1157] turns only on whether the jury specified the degree in the verdict form." (*People v. McDonald* (1984) 37 Cal.3d 351, 382, overruled in part by *People v. Mendoza* (2000) 23 Cal.4th 896 (*Mendoza*); see also *People v. Beamon* (1973) 8 Cal.3d 625, 629, fn. 2, [collectively *McDonald-Beamon*].)

"Under the *McDonald-Beamon* rule, a jury in a criminal case is required to determine the degree of the crime and if it does not, the offense is deemed to be of the lesser degree. [Citations.]" (*In re Birdwell* (1996) 50 Cal.App.4th 926, 928.) "Even if it is obvious that the jury intended to find [the greater degree], the *McDonald-Beamon* rule focuses solely on the actual verdict and does not take into account any extrinsic evidence or findings. [Citations.]" (*Id.* at p. 930.)

Gates was charged with premeditated attempted murder, and the court instructed the jury on attempted murder and premeditation and deliberation. The district attorney argued Gates "had the intent to kill" Worasing. He also explained, "deliberation and premeditation is when someone carefully weighs the considerations for and against the choices and knowing the consequences, decides to kill." The prosecutor also asserted Gates manifested deliberation and premeditation by pointing a gun at Worasing and twice pulling the trigger. We agree this evidence is sufficient to sustain a verdict of premeditated attempted murder, but that is not the issue.

The jury was not provided with a verdict form on which to make a finding that Gates acted with premeditation and deliberation. The Attorney General argues this is a technical defect, but the case cited is inapposite. In *People v. Webster* (1991) 54

16

Cal.3d 411, 447, the problem was the court's use of the verdict forms to specify a legal theory of guilt, not the failure to provide a complete verdict form.  In fact, none of the Attorney General's authorities are persuasive on the point raised by Gates.

To the contrary, under the authorities cited by Gates and the facts presented here, it was possible for the jury to find Gates guilty of attempted murder *without* necessarily finding he premeditated and deliberated that crime.  And, under *Apprendi v. New Jersey* (2000) 530 U.S. 466 and its progeny, the constitutional requirements of a jury trial and proof beyond a reasonable doubt apply to any fact that is "'legally essential to the punishment' [citation], that is, to 'any fact that exposes a defendant to a greater potential sentence' than is authorized by the jury's verdict alone [citation]." (*People v. Black* (2007) 41 Cal.4th 799, 812.)  Consequently, Gates must be resentenced on count 3 to the term prescribed for attempted murder without premeditation and deliberation.  Moreover, because the aggregate sentence imposed on all counts involved a number of discretionary sentencing determinations, we believe the better course is to vacate the entire sentence and remand the matter for a new sentencing hearing.  (§ 1260.)

17

## DISPOSITION

The convictions are affirmed.  The judgment is modified to reflect a conviction of attempted murder without premeditation or deliberation on count 2 and the clerk of the superior court is ordered to modify the abstract of judgment and forward a copy to the Department of Corrections and Rehabilitation.  The sentence is vacated and the matter remanded for a new sentencing hearing.


THOMPSON, J.

WE CONCUR:


MOORE, ACTING P. J.


ARONSON, J.

18